**PING HE (HAI NAM) COMPANY LIMITED, an alien corporation, Plaintiff,**

v.

**NONFERROUS METALS (U.S.A.) INC., a New York corporation, Defendant.**

**NONFERROUS METALS (U.S.A.) INC., a New York corporation, Plaintiff,**

v.

**AGRICULTURAL BANK OF CHINA, an alien corporation, Defendant.**

Nos. 94 CIV. 4105(SS), 94 Civ. 6161(SS).

United States District Court,
S.D. New York.

Sept. 10, 1998.

Curtis, Mallet–Prevost, Colt & Mosle, Samuel Rosenthal, Eliot Lauer, New York, for Plaintiff Ping He (Hai Nam), Company Limited and Agricultural Bank of China.

Tang & Associates, P.C., Weihua Tang, New York, for Defendant NonFerrous Metals (U.S.A.) Inc.

### MEMORANDUM ORDER AND OPINION

SOTOMAYOR, District Judge.

The two instant actions arise from a dispute between plaintiff Ping He (Hai Nam) Company Limited ("Ping He") and defendant NonFerrous Metals (U.S.A.) Inc. ("NFM") over a commodity futures trading account opened by Ping He with NFM in 1993. Ping He moves for summary judgment pursuant to Fed.R.Civ.P. 56, seeking the return of $350,000 it deposited into the account, on the grounds that NFM defrauded Ping He into opening the account, engaged in unauthorized trading, falsified an invoice, and misappropriated Ping He's funds, all in violation of the Commodity Exchange Act, 7 U.S.C. § 1 et seq., and the regulations promulgated thereunder. In opposing the motion, NFM claims that Ping He owes it more than $650,-000 in trading losses, and that triable issues of fact prevent the granting of summary judgment.

In the related action, defendant Agricultural Bank of China ("Bank of China") moves for summary judgment against NFM. NFM sues Bank of China for refusing it access to two letters of credit, totaling $800,000, which Ping He had established in favor of NFM upon opening the trading account. Bank of China now seeks dismissal of the action, arguing that it properly refused NFM access to the funds because NFM presented the Bank with fraudulent documentation.

Finally, by separate motion, Ping He and Bank of China, who are represented by the same counsel, jointly move for sanctions against NFM and NFM's counsel, pursuant to Fed.R.Civ.P. 11, based upon their alleged misconduct during this litigation.

For the reasons discussed, the Court grants Ping He's and Bank of China's respective motions for summary judgment, and imposes sanctions upon NFM's counsel.

## BACKGROUND

The following facts are undisputed. Ping He and NFM are both entities owned by the People's Republic of China. Ping He is a foreign corporation with its principal place of business in China. NFM, although owned by the Chinese government, is a New York corporation with its principal place of business in Manhattan. NFM holds itself out as being in the business of soliciting orders for the purchase and sale of commodity futures. Once an order is placed with NFM, NFM arranges for the order to be executed on American and foreign markets through registered floor brokers. NFM, however, is not and has never been registered with the Commodity Future Trading Commission ("CFTC"), or with any federal or state regulatory body in the United States, in any capacity.

In or about April 1993, Ping He agreed to open a futures trading account with NFM. The parties did not reduce their agreement to writing. However, pursuant to their oral agreement, all trades were to be non-discretionary, meaning that NFM was only authorized to execute trades for Ping He upon the express instructions of Ping He or Ping He's designated agent. Toward that end, by letter dated April 27, 1993, Ping He advised NFM that it was authorizing Mr. Li Zheng of China National Metal Products Co. ("China Metals") to act as Ping He's agent in all matters relating to its futures trading account. (*See* Ex. 2 to Li Dep.). In the letter, Ping He specified that China Metals was authorized "to do some future business of metal products directly *or through some agent* with you on our behalf." *Id.* (emphasis added).

Also in connection with opening the account, on April 19 and April 23, 1993, Ping He established two standby letters of credit in favor of NFM with Bank of China, in the amounts of $300,000 and $500,000, to cover trading margin maintenance, losses and expenses associated with the account. The terms of the letters of credit provided that NFM could draw upon the funds only after presenting Bank of China with certain documentation, including (i) a signed declaration by NFM stating that the amount being drawn was owed to NFM in relation to Ping He's commodity dealings, and (ii) a certified copy of a telex dispatched to Ping He within five working days prior to drawing from the standby letters of credit. (*See* Ex. A to Rosenthal Aff.) In May 1993, Ping He also made an initial deposit of $50,000 into the account held by NFM.

Unfortunately, nearly all facts concerning what actually happened to Ping He's trading account after it was opened are in dispute, including: whether NFM conducted any trading for Ping He; when such trading began and ended; whether trades on Ping He's account were authorized or unauthorized; and whether trades conducted for Ping He resulted in profits or losses. The parties additionally dispute whether Ping He knew when it opened the account that NFM was not registered with the CFTC.

What is clear and uncontroverted, however, is that on May 4, 1993, NFM tried to draw down on the two letters of credit, claiming that Ping He had lost $800,000 as the result of trading. Bank of China refused NFM access to the funds. Approximately one month later, on June 8, 1993, China Metals sent NFM a fax suspending the account. The letter stated:

> We are very pleased to see that we have made a little profits [sic] through those deals done with your brokerage.... As a result of our internal arrangements, we would like to inform you that we have suspended our future trading account with your brokerage effective from today. Therefore, the said standby L/Cs [letters of credit] will be canceled by an official notice given tomorrow [to Bank of China].

(Ex. C to Rosenthal Aff.) China Metals' June 8 letter also requested that NFM provide it with a list of all trades executed on the account, together with a list of all commissions charged. *Id.*

Soon afterwards, NFM sent China Metals an account invoice, dated June 16, 1993 (hereafter "the June 16 invoice"). (Ex. D to Rosenthal Aff.) The June 16 invoice stated that $344,893 was due on Ping He's account (not $800,000, as NFM had contended when it sought to draw upon the letters of credit). That figure consisted of $104,500 in alleged

trading losses and $240,393 in commissions and interest, for trading activity between the dates of April 22 and April 29, 1993. Thereafter, NFM repeatedly wrote to China Metals in June and July of 1993, demanding payment of the $344,893. (*See* June 28, June 30, and July 8, 1993 letters from NFM to China Metals; Ex. E to Rosenthal Aff.) Several months later, on December 9, 1993, Ping He wired NFM the sum of $300,000. It is also undisputed that at some point during 1993, NFM converted for its own use Ping He's $50,000 initial deposit.

Ping He brought the instant suit against NFM on June 2, 1994, claiming that NFM defrauded it at every step of their dealings. First, Ping He claims, NFM misrepresented itself as a registered commodity broker in order to induce Ping He to open an account with NFM. (Complaint ¶ 7.) Ping He further claims that, after the account opened, neither it nor China Metals ever authorized NFM to execute trades on its behalf, but that NFM nevertheless improperly charged it for large trading losses. According to Ping He, NFM either engaged in unauthorized trading on Ping He's account, charged Ping He for fictitious trades, or fraudulently allocated to Ping He's account losing trades that had been undertaken for other customers. Whichever was the case, Ping He contends that NFM's fraudulent conduct is evinced by the fact that NFM has been unable to produce any records reflecting trades ordered by Ping He or China Metals, or showing that the losing trades charged to Ping He were in fact made for Ping He's account. In addition, Ping He contends that NFM falsified the June 16 invoice, charged it grossly excessive commissions in violation of their agreement, and presented fraudulent documents to Bank of China in an attempt to draw upon the two standby letters of credit. Finally, Ping He contends that documents produced by NFM during discovery show that any trades conceivably executed by NFM on Ping He's behalf resulted in profits, not losses. By its Complaint, Ping He seeks the return of the $350,000 it paid NFM (the $50,000 May 1993 payment and the $300,000 December 1993 payment) based upon NFM's alleged fraud, unauthorized trading, conversion of funds, breach of contract and breach of fiduciary duty.

Not surprisingly, NFM offers a rather different version of events. While conceding that it never received trading instructions from Ping He or China Metals (*see* Wang Aff. ¶ 31), NFM maintains that all of the trades it conducted for Ping He were authorized by NonFerrous B.M. Corp. ("B.M.Corp."), a private New Jersey corporation (unrelated to NFM and Ping He) that China Metals allegedly retained to give trading instructions for Ping He's account. In effect, NFM claims that a two-tiered agency structure existed: Ping He authorized China Metals to act as its agent, which in turn authorized B.M. Corp. to act as *its* agent. NFM contends that it traded for Ping He upon the specific instructions of B.M. Corp., that it kept track of the trades for Ping He in an account labeled the "ZZ" account, and that such trades resulted in large losses. Furthermore, NFM maintains that Ping He knew from the outset that NFM was not registered with the CFTC. According to NFM, it had no reason to misrepresent its registration status because it was at all times legally exempt from registration. Thus, in its answer to the Complaint, NFM denied all allegations of wrongdoing and counterclaimed against Ping He for $650,000 that it claimed was still owed. (As discussed below, NFM has frequently changed its position, both prior to and during this litigation, as to how much Ping He owes it.) Furthermore, on August 26, 1994, NFM filed a separate action against Bank of China for failing to honor the two standby letters of credit after NFM allegedly presented the bank with the required documentation.

### A. *Procedural Background*

The motions presently before the Court have a long history. Ping He and Bank of China first moved for summary judgment and sanctions against NFM in or about August, 1996. At that time, NFM cross-moved for summary judgment and sanctions. Finding both sides' briefing to be grossly inadequate, on February 11, 1997, I denied all parties' motions with leave to renew. Ping He and Bank of China subsequently refiled

their joint motions for summary judgment and sanctions in May 1997. In response, NFM again cross-moved for summary judgment and sanctions against Ping He and Bank of China, and also moved to dismiss Ping He's Complaint pursuant to Fed. R.Civ.P. 9(b). At a conference held on August 22, 1997, I denied all of NFM's motions and reserved decision on Ping He's and Bank of China's motions for summary judgment and sanctions pending the submission of supplemental briefing on certain issues pertaining to NFM's registration status. The Court has now received the necessary briefing and is finally ready to consider the outstanding motions.

## DISCUSSION

### I. *Standard of Review*

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court's role on a motion for summary judgment is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986) (citing *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). In seeking summary judgment, the moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant satisfies its initial burden, the nonmoving party must then come forward with "specific

facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). If a court determines that the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Porky Prods. v. Nippon Express U.S.A., Inc.*, 1 F.Supp.2d 227, 230 (S.D.N.Y.1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). *See also Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512 (the relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

### II. *Overview of Statutory Scheme*

The Commodity Exchange Act, as amended by Congress in 1974, 7 U.S.C. § 1 et seq. ("CEA" or "the Act"), established the Commodity Futures Trading Commission (CFTC) and erected a comprehensive statutory scheme governing the trading of commodity futures by persons in the United States.[1] Congress passed the CEA in response to concerns of widespread abuses in commodity futures trading, and in order to protect investors amid "the volatile and esoteric futures trading complex." *CFTC v. Schor*, 478 U.S. 833, 836, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (quoting H.R.Rep. No. 93–975, p. 1 (1974)). The CEA charges the CFTC with enforcement of the Act, and grants the CFTC broad discretion to promulgate rules and regulations in furtherance of the Act's goals.

Central to the Act's regulatory scheme are its registration requirements, which have been hailed as "the kingpin in this statutory machinery, giving the [CFTC] the informa-

---

1. A commodity is defined under the Act as all "goods and articles, except onions." 7 U.S.C. § 1a(3). Commodity futures trading involves the purchase and sale of contracts for delivery at some future date of specific quantities of a given commodity at fixed prices. Participants in commodity futures trading generally fall into three categories: "hedgers," who are actually interested in buying or selling the commodity in question (such as farmers who grow agricultural commodities to be sold, or manufacturers who purchase the commodity for production); speculators or investors, who seek to make a profit by taking positions in the futures market based

upon their belief as to whether certain commodities will increase or decrease in price over time; and, finally, those professionals who manage the market, such as futures commission merchants, floor brokers and commodity trading advisors. The CEA requires such futures trading to be conducted at commodity exchanges designated by the CFTC as "contract markets." 7 U.S.C. § 7. For a more detailed explanation of the operation of the commodity futures trading, and of the history of the CEA's enactment, *see generally Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356–67, 102 S.Ct. 1825, 1828–33, 72 L.Ed.2d 182 (1982).

tion about participants in commodity trading which it so vitally requires to carry out its other statutory functions of monitoring and enforcing the Act." *CFTC v. British American Commodity Options Corp.*, 560 F.2d 135, 139–40 (2d Cir.1977). The registration requirements ensure that persons dealing in commodities meet certain minimum financial and fitness requirements, and enable the CFTC to monitor the trading activities of market members. *See* 7 U.S.C. § 6f.

Because of their critical importance, the CEA's registration requirements apply to nearly every class of professionals who deal in commodities. Thus, under the Act, anyone who acts as a broker and executes sales of commodities on the trading floor of a contract market must be registered as a broker under § 4e. 7 U.S.C. § 6e. Futures commission merchants ("FCMs"), who do not trade themselves on the floor, but who, like NFM, solicit transactions which are then executed through brokers, must also register, pursuant to § 4d.[2] 7 U.S.C. § 6d. Even a person who is simply "associated" with an FCM must register. *See* 7 U.S.C. § 6k. *See* CFTC Interpretative Letter No. 97–44 [1996–1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,084; 1997 WL 348744, at *2 (Jun. 9, 1997) ("The registration requirements serve to screen unfit persons from dealings with customers and thus represent an important customer safeguard. To assure that these requirements reach all persons involved in customer solicitations, the registration requirements have been construed flexibly to require the registration of persons who participate even indirectly in such solicitations.") Those who either fail to register or who misrepresent their registration status

can be criminally prosecuted. *See* 7 U.S.C. §§ 6h, 13(a)(2) (making it a felony punishable by a $1 million fine or 5–year's imprisonment for any person falsely to represent himself or herself as registered); 7 U.S.C. § 6d(1) (making it unlawful for any person to operate as an FCM unless registered).

Limited exemptions to the Act's registration requirements do exist, however. One such exemption, set forth in CFTC Rule 3.10, applies to persons who trade "solely for proprietary accounts." 17 C.F.R. § 3.10(c).[3] The term "proprietary account," as defined in Rule 1.3(y), includes an account carried by a corporation for "a business affiliate that directly or indirectly is controlled by or is under the common control with such ... corporation." 17 C.F.R. § 1.3(y). Here, NFM claims that, because it is owned by the Chinese government and traded solely for affiliated companies also under the common ownership and control of the Chinese government, it at all times fell within the "proprietary account" exemption and did not need to register under the Act. Ping He counters that NFM did not trade "solely" for Chinese-owned accounts and, therefore, can claim no exemption. Significantly, however, even if NFM did fall within the "proprietary account" exemption, Rule 3.10 conditions that exemption upon "such a person remain[ing] subject to all other provisions of the Act and of the rules, regulations and orders thereunder." 17 C.F.R. § 3.10(c). Thus, regardless of NFM's registration obligations, NFM was at all times obligated to comply with the CEA provisions and CFTC rules regulating the conduct of FCMs. *See* CFTC Interpretative Letter 88–15, [1987–1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,296

---

**2.** It is evident that, at all relevant times, NFM operated as an FCM. By its own account, NFM solicited and accepted customer orders for futures trades, which it then placed through floor brokers. (*See* NFM's 3(g) statement ¶ 2; Wang Aff. ¶ 15.) This squarely meets the CFTC's definition of an FCM as anyone who is:

> engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market and that, in or in connection with such solicitation or acceptance of orders, accepts any money ... to secure any trades or contracts that result or may result therefrom. ...

17 C.F.R. § 1.3(p). Because NFM operated as an FCM, the Court's overview of the CEA emphasizes those of the Act's requirements which apply to FCMs.

**3.** Rule 3.10(c), 17 C.F.R. § 3.10(c), provides in full that:

> A person trading solely for proprietary accounts, as defined in § 1.3(y) of this chapter, is not required to register as a future commission merchant: Provided that such a person remains subject to all other provisions of the Act and of the rules, regulations and orders thereunder.

(Aug. 10, 1988) (emphasizing that entities exempt from registration under Rule 3.10(c) still must comply with all provisions of the CEA and CFTC Rules); CFTC Interp. Letter No. 89–7, [1987–1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,479 (Jun. 22, 1989) (same).

As stated, a key purpose of the CEA is to protect customers against fraudulent and abusive trading practices by FCMs and other market participants. Toward that end, § 4b of the Act makes it unlawful for FCMs "to cheat or defraud or attempt to cheat or defraud" investors, "willfully to make or cause to be made ... any false report or statement ... [or] any false record" of sales involving futures contracts, or to engage in unauthorized trading by "willfully and knowingly" buying or selling commodities on another's behalf "without the[ir] prior consent." 7 U.S.C. § 6b(a).

Also, § 4g of the Act requires FCMs to maintain intelligible daily trading records for each customer, and to report to customers on their transactions, in the manner prescribed by the CFTC. 7 U.S.C. § 6g. In that regard, the CFTC has promulgated Rules 1.33 and 1.35, setting forth strict record-keeping and reporting requirements. Rule 1.35 requires FCMs to keep "full, complete, and systematic records" of all transactions relating to each customer, including order forms, signature cards, journals, ledgers, canceled checks, and any other notations recorded in the regular course of business. 17 C.F.R. § 1.35(a). Rule 1.35 also requires FCMs who receive customer orders to prepare "immediately" a written record of the order that contains the account identification number and is time-stamped to the nearest minute of receipt. 17 C.F.R. § 1.35(a–1)(1).[4] Finally, to prevent the commingling of trades for different customers, Rule 1.35 requires FCMs to maintain "a record of transactions which will show separately for each account" all future transactions and commodity options transactions executed, including date, price, quantity, market, commodity and future. 17 C.F.R. § 1.35(b)(2).

As for reporting, Rule 1.33 requires FCMs to send customers monthly statements setting forth, among other things, the profits or losses realized upon trades and all financial charges assessed a customer during the monthly reporting period. 17 C.F.R. § 1.33. In addition, CFTC Rule 1.55 provides that, even before a futures trading account can even be opened, FCMs must furnish customers with a risk disclosure statement, and obtain the customer's signature stating that he or she received and understood the risks disclosed. *See* 17 C.F.R. § 1.55.

The CEA empowers the CFTC to bring enforcement actions against violators of the Act and CFTC rules. *See* 7 U.S.C. § 15. Significantly, the Act also provides several avenues by which injured investors can obtain redress for violations of the Act. First, § 14 of the CEA, enacted by Congress in 1974, provides a reparations procedure whereby persons aggrieved by violations of the Act or CFTC rules can seek to recover damages from a registered industry professional by filing a complaint with the CFTC. *See* 7 U.S.C. § 18(a). Complaints brought under § 14 are adjudicated by administrative law judges or presiding CFTC officers, and reparations awards thereunder are enforceable in federal district court. *Id.* Separate and apart from this reparations procedure, § 22 of the Act, enacted in 1982, provides a private right of action permitting investors to sue directly in federal court for "actual damages" caused by another's violations of the Act. 7 U.S.C. § 25(a). It is pursuant to § 22 that Ping He now seeks to recover damages. Finally, the Act mandates each contract market to provide an arbitration mechanism under which parties can agree to arbitrate any dispute arising under the Act's provisions. *See* 7 U.S.C. §§ 7a(11); 25(a)(2).

### III. *Ping He's Motion for Summary Judgment*

Although the Complaint alleges numerous common law bases for recovery, Ping He

---

4. The reason for requiring the memorialization of orders immediately upon receipt is to discourage "mix and match" schemes, whereby winning trades are funneled to favored clients, and losing trades are marked for less favored clients. *See, e.g., Knight v. First Comm. Fin. Group, Inc.,* [1994–1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26, 515, at 43,319 (Oct. 5, 1995).

moves for summary judgment based solely upon NFM's alleged violations of the CEA. First and foremost, Ping He argues that summary judgment is required because NFM operated as an unregistered FCM in violation of § 4d. According to Ping He, this violation alone entitles it to disgorgement of the $350,000 it paid NFM. As a second, independent ground for summary judgment, Ping He argues that NFM violated CFTC Rules 1.33, 1.35 and 1.55, in failing to make required disclosures and maintain proper records. Finally, Ping He seeks summary judgment on the ground that NFM committed fraud in violation of § 4b of the Act by engaging in unauthorized trading and falsely reporting losses to Ping He.

NFM opposes summary judgment on the grounds that Ping He (i) failed to raise the CEA in its Complaint as a basis for recovery, (ii) lacks standing to sue under the CEA, and (iii) ratified NFM's conduct by paying NFM $300,000 in December 1993, months after trading on Ping He's account had ceased. NFM also maintains that it did not violate any of the CEA's provisions or CFTC rules, but that whether or not it did raises questions of fact that must be determined at trial.[5]

### (i) *Adequacy of the Complaint*

 The Court first addresses NFM's contention that Ping He should be prohibited from seeking summary judgment based upon violations of the CEA because Ping He failed to cite the CEA, or any of the regulations promulgated thereunder, as a basis for recovery in the Complaint. This argument ignores the liberal notice pleading rules that have long been a part of the federal courts. Under the Federal Rules of Civil Procedure, a complaint need not specify the legal theory or statutory provisions upon which a claim is grounded, so long as the facts alleged in the complaint are sufficient to give the defendant notice of the nature of the claim. *See* Fed. R.Civ.P. 8(a) (a complaint need only set forth

"a short and plain statement of the claim showing that the pleader is entitled to relief" and "a demand for judgment for the relief the pleader seeks"). As the Supreme Court stated in *Conley v. Gibson*, 355 U.S. 41, 47–48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957), "simplified 'notice pleading' is made possible by the liberal opportunity for discovery and other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues." *See also Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 600 (2d Cir.1991) ("federal pleading is by statement of claim, not by legal theory").

Here, while it is true that Ping He's Complaint does not allege specific violations of the CEA, or mention the CEA at all, the Complaint alleges that NFM's chairman induced Ping He to open a trading account by misrepresenting NFM to be a registered commodity broker (Complaint ¶¶ 7–10); that NFM engaged in unauthorized trading in Ping He's name (Complaint ¶¶ 5, 15–16); that NFM presented fraudulent declarations to Bank of China (Complaint ¶¶ 22–23); that NFM charged Ping He for $344,893, although it "knew that Ping He was not indebted to [NFM] for any amounts" (Complaint ¶¶ 17, 35); and that NFM wrongfully "took and converted for its own usage and benefit" a total of $350,000 of Ping He's money (Complaint ¶¶ 5, 20). These allegations are more than sufficient to permit claims for violations of the CEA's registration and anti-fraud provisions.

 A somewhat closer question is whether Ping He's Complaint alleges sufficient facts upon which to base claims for relief under the CFTC record-keeping, reporting and risk disclosure rules. The Complaint contains no allegations at all concerning NFM's failure to report, provide a risk disclosure statement, or maintain proper records. Nevertheless, I find that these claims

---

5. NFM additionally contends that Ping He is time-barred from seeking relief under the CEA. This argument is patently frivolous. Section 22(c), 7 U.S.C. § 25(c), provides that private actions under the CEA "shall be brought not later than two years after the date the cause of action arises." Here, the earliest that Ping He's cause of action could possibly have accrued was in April 1993, when Ping He opened its account with NFM. Ping He filed suit against NFM on June 2, 1994, well within the two-year limitations period.

should also be permitted. The futures trading activities at issue in Ping He's Complaint are so obviously within the regulatory province of the CEA and CFTC that NFM could not possibly be surprised by Ping He's reliance upon the CFTC rules for recovery. More importantly, the extremely long discovery period in this case provided both sides with ample notice of the legal and factual claims and defenses upon which the parties would ultimately rely, including Ping He's claims the NFM failed to keep adequate records and make required reports and disclosures. In fact, these issues have been a part of the three rounds of briefing on the instant motion, and of the intervening discovery in the action. Additionally, violations of Rules 1.33, 1.35 and 1.55 have often been treated by the CFTC as evidence of fraud, a charge the Complaint clearly makes. *See, e.g., Knight v. First Comm. Fin. Group, Inc.,* [1994–1996 Transfer Binder] Fut. Comm. L. Rep. (CCH) ¶ 26,515, at 43,319 (Oct. 5, 1995) (violations of Rules 1.55 were evidence that defendant engaged in scheme to cheat and defraud plaintiff); *In re GNP Commodities Inc.,* [1990–1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25, 360, at 39,214 (Aug. 11, 1992) (defendant's failure to place account numbers on order tickets, in violation of Rule 1.35, made possible the fraudulent allocation of trades). Finally, in the case of NFM's alleged internal record-keeping violations, under Rule 1.35, Ping He could not reasonably have been expected to know of such violations prior to discovery and, therefore, good cause exists to permit it to add these violations once discovered.

For these reasons, I find that the Complaint is adequate to permit Ping He's claims

for recovery based upon the CFTC rules, as well as the CEA itself. To reject these claims at this late hour would not serve the spirit of the Federal Rules of Civil Procedure, which "favor[ ], as a matter of high priority, that disputes be resolved on their merits" *McLearn v. Cowen & Co.,* 660 F.2d 845 (2d Cir.1981), and which direct that "[a]ll pleadings shall be so construed as to do substantial justice." Fed.R.Civ.P. 8(f).

### (ii) *Standing*

Prior to 1982, the CEA was silent on the subject of private judicial remedies for persons injured by violations of the CEA. Nevertheless, federal district and appeals courts had routinely recognized an implied private cause of action under various provisions of the statute. In 1982, the Supreme Court endorsed this view, holding that Congress intended for investors to have the right to sue for damages under at least five separate provisions of the CEA, including § 4b. *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). In so holding, however, the Court invited Congress to clarify its intent. *Id.,* 456 U.S. at 394–95, 102 S.Ct. at 1847–48. Congress did so almost immediately thereafter by enacting § 22, which explicitly provides a right of action for violations of the Act. 7 U.S.C. § 25.

Specifically, § 22 provides that any person (other than certain specified organizations not involved in this case) who violates the CEA "or who willfully aids, abets, counsels, induces, or procures the commission of a violation" of the Act, "shall be liable for actual damages" caused by the violation. 7 U.S.C. § 25(a)(1).[6] Federal district courts

---

**6.** Section 22(a)(1), 7 U.S.C. § 25(a)(1), provides: [a]ny person ... who violates this chapter or who wilfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the transactions referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any person—
(A) who received trading advice from such person for a fee;
(B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity); or who deposited with or

paid to such person money, securities, or property ... in connection with any order to make such contract;
(C) who purchased from or sold to such person or placed through such person an order for the purchase or sale of—
(i) an option subject to section 6c of this title ...;
(ii) a contract subject to section 23 of this title; or
(iii) an interest or participation in a commodity pool; or
(D) who purchased or sold a contract referred to in subparagraph (B) hereof if the violation constitutes a manipulation of the price

have exclusive jurisdiction to hear suits brought under § 22. 7 U.S.C. § 25(c). Furthermore, with certain exceptions not applicable here, the private rights of action created by § 22 are "the exclusive [judicial] remedies ... available to any person who sustains loss as a result of any alleged violation of [the Act]." 7 U.S.C. § 25(a)(2).

■ To maintain a suit under § 22, however, it is not enough to allege that a defendant violated provisions of the Act. A plaintiff must also allege that (1) it incurred "actual damages" from the alleged violation, and (2) that the damages resulted from one or more of the four transactions enumerated in subsections (A) through (D). *See* 7 U.S.C. § 25(a)(1)(A)-(D). As to this second prerequisite, Ping He bases its standing upon the transaction described in § 22(a)(1)(B), in that Ping He "deposited with or paid to [NFM] money ... in connection with any order" of a futures contract. 7 U.S.C. § 25(a)(1)(B).

NFM does not challenge Ping He's satisfaction of either of these prerequisites to maintaining an action under § 22. However, NFM claims that Ping He lacks standing to sue for lack of privity, i.e., because Ping He delegated its authority to deal with NFM to agents that are not party to this lawsuit. This argument is both legally unsupported and flatly contradicted by NFM's own statements throughout this litigation. Even if direct personal contact between a plaintiff and defendant were required to maintain an action under § 22—and NFM has presented no legal authority indicating that it is [7]— NFM conceded that privity exists when it stated in its 3(g) statement that "Ping He provided the sum of $300,000.00 to NFM ... in December 1993[and] ... the sum of $50,-000.00 to NFM as an initial margin." (NFM's 3(g) Statement ¶¶ 6–7.) NFM has repeated these contentions in its briefs, supporting affidavits, and at oral argument. (*See* NFM 1997 Opp. Brief at 13; Wang Aff. ¶ 49; Transcript of May 30, 1997 hearing, at 13.) Moreover, NFM has counterclaimed directly against Ping He on the ground that Ping He, and not some other entity or agent, owes it $650,000 in trading losses. For NFM to take these positions, yet argue that Ping He lacks privity with NFM, is preposterous.

However, there are two harder questions—both critical to whether Ping He is entitled to an award of damages in this action—which neither party has addressed. Those questions are: first, whether Ping He has satisfied the "actual damages" requirement for its claims under §§ 4b and 4d of the CEA, and Rules 1.33, 1.35 and 1.55; and second, whether private litigants have standing to sue for violations of the CFTC rules. I will address each of these questions in turn.[8]

### A. *"Actual Damages"*

■ Even if NFM violated every provision of the CEA or the CFTC rules, under the express language of § 22, Ping He is only authorized to bring suit, and can only recover, for those violations that caused Ping He to suffer "actual damages." *See* 7 U.S.C. 25(a). The term "actual damages" has been applied by courts in a straightforward manner to require a showing of actual injury caused by the violation. *See Wigod v. Chicago Mercantile Exchange*, 981 F.2d 1510, 1521–22 (7th Cir.1992) ("under the explicit terms of the statute," a private litigant has

---

of any such contract or the price of the commodity underlying such contract.

**7.** Contrary to NFM's unsupported assertion, privity or personal contact between a plaintiff and defendant does not appear to be required in order to maintain a private action under the CEA, particularly where, as here, a plaintiff's business with the defendant was conducted through an agent. *See* 7 U.S.C. § 4 (expressly providing that acts or omissions of an agent are imputed to his or her principal); *Woods v. Reno Commodities, Inc.*, 600 F.Supp. 574, 578 (D.Nev. 1984) ("[p]rivity or personal contact between the plaintiff and a defendant is not an essential ele-

ment of a [fraud] action" under the Act); *Curran*, 456 U.S. at 394, 102 S.Ct. at 1847 (prior to § 22's enactment, holding that privity not required to bring a private action under the CEA).

**8.** The briefing of this motion by both parties has been extremely poor. Neither Ping He nor NFM identified, let alone briefed, the two legal questions that are most critical to deciding whether Ping He can recover for NFM's alleged violations of the CEA and CFTC rules. This failing by the parties is particularly glaring because the Court has already admonished them for their poor briefing and required them to supplement their original briefs not once, but twice.

no standing to sue under CEA provisions unless violation of that provision caused him "actual injury"); *Apex Oil Co. v. DiMauro*, 744 F.Supp. 53, 56 (S.D.N.Y.1990) (holding that "no damages [we]re recoverable" for CEA violations where plaintiffs "ha[d] not suffered damages but ha[d] actually prospered as a result of the alleged wrongdoing"); *Kwiatkowski v. Bear Stearns Co., Inc.*, 1997 WL 538819, at * 29, 31 (S.D.N.Y. Aug. 27, 1997) (dismissing damages claim where plaintiff alleged no facts showing that he suffered any loss from the alleged violation).[9] *Cf. Curran*, 456 U.S. at 388, 102 S.Ct. at 1844 (prior to enactment of § 22, plaintiffs who brought suit under CEA's implied rights of action were likewise required to establish "the causal connection between the violations and the injury, and the amount of damages" in order to have standing). As discussed below, in the instant case, only some of Ping He's claims bear a causal link to its loss of $350,000; those claims that do not must be dismissed.

### (i) Ping He's § 4d claim: failure to register

■ First and foremost, Ping He seeks to recover $350,000 on the basis that NFM failed to register as an FCM, in violation of § 4d of the Act. However, Ping He offers no evidence or basis for believing that it incurred damages simply by dealing with an unregistered FCM. As a logical matter, it is unlikely that any private litigant could show "actual damages" flowing from a § 4d violation because, as courts and the CFTC have recognized, an FCM's unregistered status, in and of itself, does not cause another financial damage. *See Marshall v. Green Giant Co.*, 942 F.2d 539, 546 (8th Cir.1991) ("A party does not suffer damage merely by dealing with an unregistered FCM; failure to register, without more, does not cause pecuniary loss."); *Hofmayer v. Dean Witter & Co., Inc.*, 459 F.Supp. 733, 739 & n. 4 (N.D.Ca. 1978) ("[t]he mere failure to register does not amount to fraud, deceit or misrepresentation sufficient to justify rescission.... [A] causal connection between the failure to register and the damage would have to be alleged."); *Hall v. Paine Webber Jackson & Curtis, Inc.*, [1986–1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 23,317, at 32,890 n. 4 (Oct. 8, 1986) (customer's damages were not proximately caused by violation of registration provision).[10]

9. Similarly, in § 14 reparations proceedings, claimants may only recover "actual damages proximately caused by" the violation. 7 U.S.C. § 18(a)(1)(A). *See e.g., Nacht v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, [1992–1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,057, at 41,395 (Apr. 19, 1994) (reversing reparations award in § 14 proceeding because there was "no causal link" between respondent's violation and complainant's losses).

10. Throughout this litigation, Ping He has argued that, as a matter of black-letter law, the mere violation of § 4d, if proven, automatically entitles it to disgorgement of $350,000. Not only does this argument ignore the express language of § 22, which requires a showing of "actual damages," it also mistakenly relies for support upon CFTC enforcement actions, not private litigations. *See CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92 (2d Cir.1986) (ordering disgorgement as penalty for defendant's failure to register as FCM and systematic fraudulent conduct); *CFTC v. American Bd. of Trade, Inc.*, 803 F.2d 1242, 1252 (2d Cir.1986) (ordering disgorgement on the basis of defendants' engagement in prohibited transactions under the Act). In relying upon these cases, Ping He misunderstands the critical difference between actions by the CFTC and private litigants. Unlike private litigants, the CFTC is charged by Congress with enforcing all of the CEA's provisions and CFTC rules. In performing that duty, the CFTC can impose penalties upon violators of the Act even where no customer has been harmed; in fact, disgorgement of profits may be particularly effective in that instance because it may deter future illegal conduct and prevent customers from being injured. *See British Am. Commodity Options*, 788 F.2d at 94 ("[w]e have recognized that disgorgement serves the purpose of depriving the wrongdoer of his ill-gotten gains and deterring violations of law"); *American Bd. of Trade*, 803 F.2d at 1252 (noting that disgorgement effectuates the CEA's purpose of protecting the investor, although it "is not designed principally to provide a remedy for parties injured by the unlawful conduct"). In contrast, there is no legal justification for permitting private litigants to recover damages unless they can show that they were personally harmed by the defendant's violation, in the amount of damages sought. The Supreme Court made this same point in *Bangor Punta Operations, Inc. v. Bangor Aroostook R.R. Co.*, 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974), where it expressly rejected the claim that deterrence goals alone would justify private damages under the securities and federal antitrust laws. The Court stated:

Our difficulty with this argument is that it proves too much. If deterrence were the only

If Ping He can assert any damages claim based upon NFM's unregistered status, it is one under § 4b of Act, on the grounds that NFM fraudulently induced it to open a futures trading account by misrepresenting or concealing its unregistered status. Cast as a fraudulent inducement claim, there is a causal link between NFM's alleged violation of the statute and Ping He's out-of-pocket losses because, the argument goes, "but for" NFM's misrepresentation or concealment of its unregistered status, a material fact, Ping He would not have opened the account with NFM and would not have incurred any losses. Notably, the CFTC has repeatedly endorsed this analytical approach in § 14 reparations proceedings. *See Hall v. Paine Webber Jackson & Curtis, Inc.*, [1986–1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 23,317, at 32,890 n. 4 (Oct. 8, 1986) (holding that damages are recoverable under § 4b for defendant's failure to disclosure unregistered status; damages are not, however, proximately caused by violation of registration provision); *Stern v. G.H. Miller & Co.*, [1990–1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,338, at 39,104 n. 2 (Jul. 21, 1992) (holding that a defendant's failure to disclose his unregistered status is actionable as a violation of § 4b, not § 4d).[11]

■ It is not clear why Ping He failed to include a fraudulent inducement claim in this motion, particularly given that the Complaint pleads such a claim. (*See* Complaint ¶¶ 7–9, alleging that "[i]n or about 1993, Xiao Tongying, Chairman of [NFM], was introduced to Ping He and represented that ... [NFM] was a licensed commodity broker," and that Ping He opened an account with NFM "relying on such representations.") However, even had Ping He's asserted a fraudulent inducement claim, summary judgment would

have been denied because a material factual dispute exists as to whether NFM misrepresented or concealed its unregistered status from Ping He. Ping He has not submitted any evidence, in the form of affidavits or otherwise, to support the Complaint's allegations of fraudulent inducement. NFM, on the other hand, has submitted the affidavit of Xiao Tongying, the person alleged to have misrepresented NFM's registration status to Ping He, in which Mr. Xiao denies that any false representations were made. Specifically, Mr. Xiao states:

> [the allegation] that I made representations that NFM was a licensed commodity broker ... is completely untrue. I never was introduced or spoke with any employee or officer of Ping He and never made any of [the] representations set forth in ... the complaint.... Moreover I never made any such representations to [ ] China Metals or [ ] B.M. [Corp.]. There was never any direct communication between Ping He and NFM. Indeed, Ping He does not identify the individual I allegedly spoke or communicated with. This allegation is a total sham.

(Xiao Aff. ¶¶ 2–3, 5–6.) Mr. Xiao further contends that "NFM always made it clear to its customers that it was not a licensed commodity broker before its representation of them." (Xiao Aff. ¶¶ 7–8.)

Mr. Xiao's affidavit sufficiently rebuts Ping He's allegations of fraudulent inducement so as to raise a material factual issue as to whether any misrepresentation was made. Accordingly, even had Ping He asserted a fraudulent inducement claim under § 4b,

---

objective, then in logic any plaintiff willing to file a complaint would suffice. No injury or violation of a legal duty to the particular plaintiff would have to be alleged. The only prerequisite would be that the plaintiff agree to accept the recovery, lest the supposed wrongdoer be allowed to escape a reckoning. Suffice it to say that we have been referred to no authority which would support so novel a result, and we decline to accept it.

417 U.S. at 717, 94 S.Ct. at 2586. Likewise, here, I reject Ping He's argument that NFM's violation of § 4d or any other provision of the

CEA will automatically entitle Ping He to disgorgement of $350,000. Before damages will issue, Ping He must establish some causal link between the violation and its losses, as § 22 requires.

11. Alternatively, Ping He might have been able to assert its fraudulent inducement claim under § 4h of the CEA, which makes it "unlawful for any person falsely to represent such person to be ... a registrant under this chapter." 7 U.S.C. § 6h.

summary judgment could not have been granted on that basis.[12]

### (ii) Ping He's § 4b claims: unauthorized trading, false invoice

■ Now I assess whether Ping He has established a causal link between its damages and NFM's alleged unauthorized trading and preparation of a false invoice, in violation of § 4b. As to these claims, I find that the "actual damages" element has been met. Certainly, if all of NFM's trading for Ping He was unauthorized, then NFM's conduct would have directly caused Ping He's loss of $350,000, the amount it paid NFM for trading losses and associated commissions. Likewise, if NFM sent Ping He a falsified invoice reporting losses that did not exist, then Ping He would be entitled to recover the money it paid on that invoice. Of course, it remains to be determined whether these violations can be found at the summary judgment stage, or whether disputed factual issues require these issues to go to trial. That examination will be undertaken later in this opinion. At present, however, I find that because Ping He's claims under § 4b satisfy the "actual damages" element, Ping He will be entitled to recovery if it proves the violations alleged.

### (iii) Ping He's claims under Rules 1.33, 1.35 and 1.55

■ As mentioned earlier, Rule 1.33 requires FCMs to send customers monthly statements setting forth, among other things, the profits or losses realized upon trades and all financial charges assessed a customer during the monthly reporting period. 17 C.F.R. § 1.33. Here, there is no question that NFM violated Rule 1.33. NFM has not produced copies of any monthly reports it prepared for Ping He's account, nor does NFM maintain that it ever prepared such reports for Ping He, or Ping He's agent. Indeed, the only evidence of any report prepared by NFM in connection with Ping He's account is

the June 16 invoice, which China Metals specifically requested. Nevertheless, Ping He's damages claim under Rule 1.33 must be dismissed because Ping He has never contended that NFM's failure to issue it monthly reports between April 1993, when Ping He opened its account, and June 1993, when it suspended the account, is what caused its loss of $350,000. Accordingly, I dismiss Ping He's Rule 1.33 claim for bearing no connection to the damages it now seeks.[13]

■ Ping He has, however, made a case for actual injury by NFM's violation of Rule 1.35. As indicated above, Rule 1.35 imposes numerous record-keeping requirements upon FCMs. The requirements are intended to ensure the complete segregation of customer accounts, the correct attribution of trades to the customers who ordered them, and the maintenance of detailed records for every transaction relating to each customer account. See 17 C.F.R. § 1.35. Here, Ping He claims that NFM failed so miserably to comply with any of Rule 1.35's requirements, that any demand by NFM for the payment of trading losses was guaranteed to be false because NFM had no way of itself knowing or checking what trades had been done for Ping He, and whether those trades had produced profits or losses. Indeed, Ping He claims that NFM's violations of Rule 1.35 were so pervasive, as to suggest strongly the commission of fraud. See *Knight v. First Comm. Fin. Group, Inc.,* [1996–1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,942, at 44,553 (Jan. 14, 1997) (holding that "[v]iolations of Rule 1.35 may be indicative of fraudulent trading"); *In re Preskin,* [1990–1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25, 235 (Feb. 10, 1992) (treating record-keeping violations as evidence of fraud scheme). I agree that if NFM's violation of Rule 1.35 is demonstrated to be as pervasive as Ping He claims, then a causal

---

12. In light of the Court's findings that Ping He can not establish damages under § 4d, and would not be entitled to summary judgment on a claim of fraudulent inducement based upon Ping He's unregistered status, the Court has no need to decide at this juncture whether NFM in fact violated the Act's registration requirements.

13. As in the case of Ping He's § 4d claim, it appears that Ping He has raised NFM's Rule 1.33 violation only because of its mistaken belief that any violation of the Act or CFTC rules by NFM will automatically entitle it to damages, regardless of whether the violation caused it to suffer actual injury. That is not what § 22 provides, however. See *supra* note 10.

connection will have been established between the NFM's violation of the rule and Ping He's payment of $350,000 for completely unverifiable trading losses.

Finally, I must decide whether Ping He can maintain a claim under Rule 1.55. As stated earlier, Rule 1.55 prohibits any FCM from opening a commodity futures account for any customer unless the FCM has first provided the customer with a risk disclosure statement containing the prescribed language under the rule, and received a signed acknowledgment from the customer stating that he or she received and understood the statement. 17 C.F.R. § 1.55. As in the case of Ping He's Rule 1.33 claim, there is no question that NFM violated Rule 1.55. It is undisputed that NFM did not provide Ping He, or any agent of Ping He, with the required risk disclosure statement, either before it opened Ping He's account or any time thereafter. However, Ping He also has never alleged, in its Complaint or any time thereafter, that this was the cause of its losses, or that it was unaware of the risks associated with commodity futures trading.

■ While it would seem proper, therefore, to dismiss Ping He's Rule 1.55 claim for failure to establish "actual damages," the CFTC has held in reparations proceedings that Rule 1.55 is so critical to protecting customers that, when an FCM violates the rule, a causal link between the customer's damages and the Rule 1.55 violation will be presumed. *See Sher v. Dean Witter Reynolds, Inc.,* [1984–1986 Transfer Binder] Comm. Fut. L. Rep. ¶ 22,266 at 29,371 (Jun. 13, 1984) (violations of Rule 1.55 automatically give rise "to a rebuttable presumption that the customer relied upon the FCM's failure to disclose the facts contained in the risk disclosure statement" in agreeing to open a trading account). In order to rebut the presumption of causality, the FCM "bears the heavy burden of presenting facts which compel the conclusion that, had the risk disclosure statement been presented, the customer would have been indifferent to the facts revealed therein." *Id.* If that burden is not met, then all losses incurred by the customer relating to the account will be regarded as proximately caused by the Rule 1.55 violation. *Id.,* at * 12. *See, e.g., Thompson v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* [1984–1986 Transfer Binder] Comm. Fut. L. Rep. ¶ 22,531, at 30,293 (Mar. 12, 1985) (awarding customer all trading losses where FCM was unable to produce copy of risk disclosure statement it claimed to have sent, and failed to meet burden of showing that customer was aware of trading risks through other means).

■ On the basis of CFTC precedent, I will not dismiss Ping He's Rule 1.55 claim for failure to show "actual damages." However, I also cannot decide this claim upon summary judgment. Neither side has submitted any factual information whatsoever concerning what risk disclosures, if any, NFM made to Ping He (or its agent), what prior experiences Ping He had in futures trading, or any anything else that might bear upon the presumption issue. Certainly, it is NFM's burden to present such evidence, but in the face of a completely bare record, and both sides' failure to address the relevant legal or factual elements bearing upon this Rule 1.55 claim, it cannot be decided without further factual development.

For the reasons stated, the Court dismisses Ping He's claim of registration violations under § 4d, and its claim of monthly reporting violations under Rule 1.33, for failure to meet the "actual damages" prerequisite. Furthermore, I deny summary judgment on Ping He's claim under Rules 1.55 for the reasons stated. All that remains to be decided, therefore, is whether, Ping He can prevail, at the summary judgment phase, upon its claims under § 4b, for NFM's alleged unauthorized trading and preparation of a false invoice, and under Rule 1.35, for record-keeping violations. Before turning to these outstanding issues, however, the Court first must resolve the second important standing issue not addressed by the parties, namely whether violations of Rule 1.35 permit a private right action.[14]

---

14. The question likewise remains as to whether Rule 1.55 permits a private right of action. However, because Ping He's Rule 1.55 claim cannot be decided upon this motion, and because I conclude that Ping He is entitled to summary judgment on other grounds, I need not address

## B. *Does Rule 1.35 Provide a Private Right of Action?*

On its face, § 22 of the CEA provides a private right of action only for violations of "this chapter," namely, the Act itself. Nothing in the CEA or CFTC rules expressly provides a private right of action under Rule 1.35, or any other CFTC rule. The question this Court must answer, therefore, is whether the statute implies such a right under Rule 1.35. For the reasons discussed below, I conclude that it does.

"The starting point in every case involving construction of a statute is the language itself." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976) (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975). Here, the enabling statutory provision for Rule 1.35 is § 4g of the CEA, 7 U.S.C. § 6g, entitled, "Reporting and recordkeeping." Section 4g provides, in relevant part:

(a) In general. Every person registered hereunder as futures commission merchant ... shall make such reports as are required by the Commission regarding the transactions and positions of such person, and the transactions and positions of the customer thereof, in commodities for future delivery on any board of trade in the United States or elsewhere; shall keep books and records pertaining to such transactions and positions in such form and manner and for such period as may be required by the Commission; and shall keep such books and records open to inspection by any representative of the Commission or the United States Department of Justice.

(b) Daily trading records: clearinghouses and contract markets. Every clearinghouse and contract market shall maintain daily trading records. The daily trading records shall include such information as the Commission shall prescribe by rule.

(c) Daily trading records: ... futures commission merchants.... [F]utures commission merchants shall maintain daily trading records for each customer in such manner and form as to be identifiable with the trades referred to in subsection (b) of this section.

(d) Daily trading records: forms and reports. Daily trading records shall be maintained in a form suitable to the Commission for such period as may be required by the Commission. Reports shall be made from the records maintained at such times and at such places and in such form as the Commission may prescribe by rule, order, or regulation in order to protect the public interest and the interest of persons trading in commodity futures.

7 U.S.C. § 6g(a)-(d).

Acting upon § 4g's directive to "fill in the blanks," the CFTC promulgated Rule 1.35, setting forth comprehensive, mandatory record-keeping requirements for FCMs, other market members (i.e. floor brokers), contract markets and clearinghouses. Those recordkeeping requirements applicable to FCMs are the following:

Futures commission merchants ... shall keep full, complete, and systematic records, together with all pertinent data and memoranda, of all transactions relating to its business of dealing in commodity futures... Included among such records shall be all orders (filled, unfilled, or canceled), trading cards, signature cards, street books, journals, ledges, canceled checks, copies of confirmations, copies of statements of purchase and sale, and all other records, data and memoranda, which have been prepared in the course of its business of dealing in commodity futures....

Rule 1.35(a).

Each futures commission merchant ... receiving a customer's or option customer's order shall immediately upon receipt thereof prepare a written record of such order, including the account identification and order number, and shall record thereon, by time-stamp or other timing device,

---

it. I do note, however, that the one federal court that has directly addressed the issue concluded that Rule 1.55 does not imply a private right of action. *See Khalid Bin Alwaleed Foundation v. E.F. Hutton & Co., Inc.*, 709 F.Supp. 815, 820 (N.D.Ill.1989).

the date and time, to the nearest minute, the order is received....

17 C.F.R. § 1.35(a–1)(1).

> Each futures commission merchant ... shall, as a minimum requirement, prepare regularly and promptly, and keep systematically and in permanent form, the following:
>
> (1) A financial ledger record which will show separately for each customer or option customer all charges against and credits to such customer's or option customers' account, including but not limited to customer funds deposited, withdrawn and transferred, and charges or credits resulting from losses or gains on closed transactions;
>
> (2) A record of transactions which will show separately for each account (including proprietary accounts): (i) All commodity futures transactions executed for such account, including the date, price, quantity, market, commodity and future; and ...
>
> (3) A record or journal which will separately show for each business day complete details of: (i) All commodity futures transactions executed on that day, including the date, price, quantity, market, commodity, future and the person for whom such transaction was made.

17 C.F.R. § 1.35(a–2)(2). Ping He claims that NFM violated each one of Rule 1.35's requirements of FCMs. Ping He has not asserted a claim, however, under § 4g of the statute.

Whether violations of Rule 1.35 permit a private right of action is a question of first impression in this Circuit. Indeed, this Court has found only one decision by any federal court addressing whether an implied private right of action exists under Rule 1.35; that court stated, without referring to Rule 1.35 specifically, that such a right is available. *See Woods v. Reno Commodities, Inc.,* 600 F.Supp. 574, 580 (D.Nev.1984) (stating "[f]ailure to maintain adequate records, as required by federal statute *and regulations promulgated thereunder,* certainly would be actionable if it were proved ... that the

failure was the proximate cause of damages to the plaintiff") (emphasis added).

The broader question of whether *any* of the CFTC rules imply a private right of action has, similarly, been only sparsely addressed by federal courts, with conflicting results. Several courts have broadly held that none of the CFTC rules permit a private cause of action; others, in more narrow holdings, have declined to imply a right of action under particular CFTC rules; and still others have stated that private rights of action do exist under the CFTC rules. *See Fustok v. Conticommodity Servs., Inc.,* 618 F.Supp. 1069 (S.D.N.Y.1985) (no private right of action under Rule 166.3); *Bennett v. E.F. Hutton Co., Inc.,* 597 F.Supp. 1547 (N.D.Oh.1984) (same); *Khalid Bin Alwaleed Found. v. E.F. Hutton & Co., Inc.,* 709 F.Supp. 815, 820 (1989) (broadly holding that none of the CFTC rules permit private rights of action). *In re ContiCommodity Servs., Inc., Sec. Litig.,* 733 F.Supp. 1555, 1568 (N.D.Ill.1990) (same); *Procter & Gamble Co. v. Bankers Trust Co.,* 925 F.Supp. 1270, 1287–88 (S.D.Oh.1996) same); *But see Irvine v. Cargill Investor Servs., Inc.,* 799 F.2d 1461, 1462 n. 3 (11th Cir.1986) (stating, without deciding the issue, "[w]e believe there probably is ⌊ ⌋ a [private] cause of action" under the CFTC rules); *Point Landing Inc. v. Omni Capital Int'l, Ltd.,* 795 F.2d 415, 418 n. 4 (5th Cir. 1986) (holding that while the plaintiffs' claims were outside the scope of § 4b of the CEA, their claims "may however be cognizable under ... [CFTC] Regulation 32.9, 17 C.F.R. § 32.9, or under Regulation 30.02, 17 C.F.R. § 30.02."), *aff'd sub nom. Omni Capital Int'l v. Rudolf Wolff and Co., Ltd.,* 484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987); *Kleinberg v. Bear Stearns & Co.,* 1985 WL 1625 (S.D.N.Y.1985) (holding that implied private right of action exists under CFTC Rule 30.02).[15] The Second Circuit has not yet spoken to the issue.

Significantly, even the proper methodology for determining whether an implied right of action exists under an agency rule is not

---

**15.** The two appeals court decisions, *Irvine* and *Point Landing,* engaged in no discussion whatsoever about whether CFTC rules imply a right of action, except for making the passing references that have been quoted here.

settled. While in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court defined the parameters for assessing whether an implied private right is available under a federal *statute*, the Court did not consider the availability of such a right under an agency rule.[16] In the absence of any direction to the contrary, many federal courts have simply applied *Cort* and its progeny in the agency rule context, focusing upon whether Congress intended to provide a private right of action under the rule in question. *See e.g., Khalid Bin Alwaleed Found.*, 709 F.Supp. at 818–820 (applying *Cort* factors in assessing whether CFTC rules imply private right of action). However, a number of federal appeals courts have held that a different mode of analysis should apply where, as here, Congress clearly provided a right of action under the statute, and the only question is whether that right should likewise extend to the agency rules promulgated thereunder. *See Angelastro v. Prudential–Bache Secs., Inc.*, 764 F.2d 939 (3d Cir.1985); *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 536–37 (9th Cir.1984); *Ashbrook v. Block*, 917 F.2d 918, 926 (6th Cir.1990); *Lowrey v. Texas A & M Univ. System*, 117 F.3d 242, 253 n. 20 (5th Cir.1997).

In *Angelastro*, the Third Circuit, concurring with the Ninth Circuit's analysis in *Robertson*, declared that "if Congress intended to permit private actions for violations of the statute, it would be anomalous to preclude private parties from suing under the rules that impart meaning to the statute." 764 F.2d at 947 (quoting Note, Private Causes of Action Under SEC Rule 14e–3, 51 Geo. Wash. L.Rev. 290, 303 (1983)). Accordingly,

*Angelastro* held that once it is determined that a statutory provision expressly or impliedly permits a private right of action, courts should also imply a private right of action under any agency rule promulgated pursuant to that provision, so long as: (1) the agency rule is properly within the scope of the enabling statute, and (2) implying a private right of action will further the purpose of the enabling statute. *Id.*

Unlike a *Cort* analysis, the focus of the *Angelastro* inquiry is not on congressional intent. The Third Circuit reasoned that "an inquiry into 'congressional intent' underlying an agency rule would not appear appropriate, because a court reaches this point of analysis only after it has already concluded that Congress intended the statute to give rise to private actions." 764 F.2d at 947. (If the enabling statute provides no private right of action then, clearly, *Angelastro* provides, there can be no private right of action under the agency rule "since an agency's rulemaking power cannot exceed the authority granted to it by Congress." *Id.*) *Accord Robertson*, 749 F.2d at 536 ("[I]f the rule in question is valid and furthers the substantive purposes of the enabling statute, and the statute provides a private right of action as a matter of congressional intent, we will imply the private right of action into the rule as well, regardless of agency intent. To do otherwise might constitute an unwarranted frustration of Congress' desire to supplement agency action with private enforcement.") Applying this analytical framework in the securities law context, both *Angelastro* and *Robertson* found an implied right of action to exist under SEC Rule 10b–16. *See Angelas-*

**16.** In *Cort v. Ash*, the Supreme Court announced that, "in determining whether a private remedy is implicit in a statute not expressly providing one," four factors should be considered: (1) whether the plaintiff belongs to the class for whose "especial benefit" the statute was enacted; (2) whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one"; (3) whether implication of a private remedy is consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action is one usually relegated to state law, such that it would be improper to infer a cause of action based solely on federal law. 422 U.S. at 78, 95 S.Ct. at 2087.

Subsequently, the Supreme Court clarified that the four *Cort* factors are not entitled to equal weight and that the central prong is the second one, namely whether Congress intended to create a private right of action. *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979); *McClellan v. Cablevision of Conn., Inc.*, 149 F.3d 161, 169 (2d Cir.1998) ("Recent Supreme Court decisions have refocused the *Cort* analysis to 'emphasize the centrality of the second factor—congressional intent,' treating the other factors as 'proxies for legislative intent.' ") (quoting *DiLaura v. Power Auth. of N.Y.*, 982 F.2d 73, 77–78 (2d Cir.1992) (other citations omitted.))

*tro,* 764 F.2d at 949–50; *Robertson,* 749 F.2d at 537–39.

The *Angelastro* framework has been endorsed by at least three district courts in this Circuit, and by other federal appeals courts. *See Metzner v. D.H. Blair & Co.,* 689 F.Supp. 262, 267 (S.D.N.Y.1988) (finding implied right of action under SEC Rule 10b–16, based upon "the excellent analysis contained in *Angelastro* "); *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.,* 1996 WL 14440, at * 8–9 (S.D.N.Y. Jan.16, 1996) (applying *Angelastro* framework in holding that implied private right of action exists under SEC Rule 10b–21), *aff'd in part, vacated in part* 106 F.3d 11 (2d Cir.1997);[17] *Graham v. Niagara Mohawk Power Corp.,* 852 F.Supp. 150, 151 (N.D.N.Y.1994) (applying *Angelastro* analysis to regulations promulgated under Atomic Energy Act). *See also Ashbrook v. Block,* 917 F.2d 918, 926 (6th Cir.1990) (applying *Angelastro* methodology to regulations promulgated pursuant to Consolidated Farm and Rural Development Act); *Lowrey v. Texas A & M Univ. System,* 117 F.3d 242, 253 n. 20 (5th Cir.1997) (applying *Angelastro* methodology to Department of Education rule promulgated under Title IX); *Corestates Trust Fee Litig. v. Corestates Bank, N.A.,* 39 F.3d 61, 68 (3d Cir.1994) (applying *Angelastro* analysis to regulations promulgated under National Bank Act).

The Second Circuit, however, has yet to endorse the *Angelastro* methodology, although it has had a few recent opportunities to do so. For instance, in *Drake v. Delta Air Lines, Inc.,* 147 F.3d 169, 170 (2d Cir.1998), the Second Circuit recently upheld the district court's determination, based upon a traditional *Cort* analysis, that FAA drug testing regulations do not provide a private right of action. In doing so, the Second Circuit made no mention of *Angelastro,* and summarily affirmed the decision "for the reasons stated in [the district court's] thoughtful and de-

tailed opinion[ ] below." 147 F.3d 169, 170. Likewise in *Cushing v. Moore,* 970 F.2d 1103 (2d Cir.1992), the Court adopted the district court's *Cort* analysis of whether Food and Drug Administration regulations afford a private right of action, affirming that the regulations do not. *Id.* at 1106. Again there was no mention of the *Angelastro* approach.[18] In light of these holdings, it is not clear to this Court whether or not the Second Circuit approves of the *Angelastro* framework or not. However, I need not reconcile this issue, because, as discussed below, I conclude that Rule 1.35 implies a private right of action whether analyzed under either the *Angelastro* or *Cort* framework.

First, under the *Angelastro* approach, there is no question that Rule 1.35 implies a private right of action. The enabling statutory provision in this case, § 4g, plainly allows for private actions by virtue of § 22. Thus, under *Angelastro,* so long as Rule 1.35 is properly within § 4g's scope and furthers § 4g's purpose, an implied private right of action should be found under the rule. Both of these conditions are easily met. Rule 1.35's mandatory record-keeping requirements are well within Congress' broad grant of authority to the CFTC, in § 4g, to dictate "the form and manner" of books and records that FCM's must keep. Furthermore, Rule 1.35 clearly serves § 4g's purpose of protecting investors by ensuring that "daily trading records for each customer [are maintained] in such manner and form as to be identifiable" 7 U.S.C. § 6g(c).

Even under the more stringent *Cort* framework, there is reason to conclude that Rule 1.35 implies a private right of action. As indicated above, "the ultimate issue" under a *Cort* analysis "is whether Congress intended to create [the] private right of action" asserted by the plaintiff. *California v. Sierra Club,* 451 U.S. 287, 293, 101 S.Ct.

**17.** In *Advanced Magnetics,* the appeal heard by the Second Circuit did not concern the district court's finding of an implied private right of action under Rule 10b–21. Thus, the Second Circuit did not address in that case whether the district court properly employed the *Angelastro* methodology.

**18.** The *Drake* and *Cushing* holdings are easily reconcilable with the *Angelastro* approach, however, because in both of those cases, the district courts concluded that the enabling statutes themselves did not provide a private right of action. Thus, even under the *Angelastro* framework, no private right of action under the regulations would have been found. *See Angelastro,* 764 F.2d at 947.

1775, 1779, 68 L.Ed.2d 101 (1981). Toward that end, the four factors specified in *Cort*, *see supra* note 16, are regarded as "criteria through which this intent could be discerned." *Id.* at 293, 101 S.Ct. at 1779.

The first *Cort* factor asks whether Ping He, an investor in commodity futures, is a member of the class for whose "especial benefit" the CEA and Rule 1.35 were enacted. *See Cort*, 422 U.S. at 78, 95 S.Ct. at 2087. The answer is "yes." As the Supreme Court stated in *Curran*, "it is almost self-evident that legislation regulating future trading was for the 'especial benefit' of futures traders;" 456 U.S. at 390, 102 S.Ct. at 1845 (quoting with approval, *Leist v. Simplot*, 638 F.2d 283, 306–307 (2d Cir.1980) (J. Friendly)). In addition, § 4g's record-keeping requirements are particularly customer-focused, in that they require FCMs to keep daily trading records pertaining to "each customer," and to report to customers from those records. As § 4g is the enabling provision for Rule 1.35, it is clear that Ping He is likewise within the class of persons intended to benefit from that rule.

Under the second *Cort* factor, the most crucial, I must consider whether there is any indication of an explicit or implicit intent by Congress to create or deny a private remedy under Rule 1.35. *See McClellan v. Cablevision of Conn., Inc.*, 149 F.3d 161, 169 (2d Cir.1998) (second *Cort* factor is the most important). Admittedly, the legislative history underlying § 22, like § 22 itself, is silent on whether Congress intended to provide a private cause of action under the CFTC rules. While the House Report filed in 1982 on the proposed § 22 stressed that creating a private right of action under the Act was "critical to protecting the public and fundamental to maintaining the credibility of the futures market," the report spoke only of a private right of action "for recovery of actual damages against violators of *the Act*." H.R.Rep. No. 565, 97th Cong.2d Sess. pt. 1 at 57, reprinted in 1982 U.S.Code Cong. & Admin. News 3906 (emphasis added).

This does not end the inquiry, however. As the Supreme Court has recognized, if congressional silence were always to be treated as a sign that Congress meant to deny a private remedy, then the implied cause of action doctrine "would be a virtual dead letter." *Thompson v. Thompson*, 484 U.S. 174, 179, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988). Accordingly, even where a statute and legislative history are silent, "Congress' 'intent [to imply a private right of action] may appear implicitly in the language or structure of the statute, or in the circumstances of its enactment.'" *Id.* (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 18, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979)). *See also Touche Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979) ("as with any case involving the interpretation of a statute," determining whether Congress intended to create a private right of action "must begin with the language of the statute itself").

In this case, Congress's intent to imply a right of action under Rule 1.35 or any other CFTC rule is called into serious question by the language discrepancy between § 14 and § 22 of the CEA. Section 14, enacted by Congress in 1974, provides an avenue of administrative relief to anyone complaining of a violation of "this chapter *or any rule, regulation or order thereunder.*" 7 U.S.C. § 18(a) (emphasis added). In contrast, the private right of action enacted eight years later in § 22 permits recovery only for violations of "this chapter," without any mention of a remedy for violations of the CFTC rules, regulations or orders. 7 U.S.C. § 25(a). The Supreme Court has stated that, "where Congress includes particular language in one section of statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Field v. Mans*, 516 U.S. 59, 67, 116 S.Ct. 437, 442, 133 L.Ed.2d 351 (1995) (quoting *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983)). *See also Transamerica, supra*, 444 U.S. at 19, 100 S.Ct. at 247 (1979) (warning that "where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it").

Heeding this statutory construction warning (which the Supreme Court has referred

to as the "negative pregnant" argument, *see Field*, 516 U.S. at 67, 116 S.Ct. at 442), several courts have held that damages claims for CFTC violations can be brought in § 14 reparations proceedings, but not in federal lawsuits. *See Khalid Bin Alwaleed Foundation*, 709 F.Supp. at 819–20 (concluding that "Congress intended the private right of action [in § 22] to be a necessary exception to the general rule of CFTC enforcement and as such to be limited to its terms, i.e., for violations of the CEA itself"); *In re Conti-Commodity Servs., Inc., Sec. Litig.*, 733 F.Supp. 1555, 1568 (N.D.Ill.1990) ("[c]laims for violation of CFTC regulations can only be pursued in reparation proceedings under § 14 of the CEA, not in civil actions for damages pursuant to § 22"); *Procter & Gamble Co. v. Bankers Trust Co.*, 925 F.Supp. 1270, 1287–88 (S.D.Oh.1996) ("[t]he better reasoned rule of law is that" the CFTC Rules are enforceable only in CFTC enforcement actions and "d[o] not give rise to a private cause of action").

While I agree that the language discrepancy between § 14 and § 22 is significant, it gives rise only to a presumption. *See Field v. Mans, supra*, 516 U.S. at 67, 116 S.Ct. at 442 (there may be reasons "why the negative pregnant argument should not be elevated to the level of interpretive trump card," particularly if such an inference would lead to an unreasonable result); *California v. Sierra Club, supra*, 451 U.S. at 295 n. 6, 101 S.Ct. at 1780 n. 6 ("[t]he creation of one explicit mode of enforcement is not dispositive of congressional intent with respect to other complimentary remedies") (citations omitted). Certainly, the disparity between § 14 and § 22, without more, does not conclusively establish that Congress intended to permit recovery for CFTC rule violations in reparations proceedings, but bar such recovery in federal court. Indeed, in *Curran*, the Supreme Court emphasized the importance of private judicial remedies to the overall scheme of the CEA, stating that § 14 reparations proce-

dures were "intended to supplement rather than supplant the implied judicial remedy ....[and] do not substitute for the private remedy either as a means of compensating injured traders or as a means of enforcing compliance with the statute." *Curran*, 456 U.S. at 384, 102 S.Ct. at 1842.

In the instant case, based upon the language and structure of § 4g, and its relationship to Rule 1.35, I am persuaded that the presumption is overcome, and that a private right of action should be implied under Rule 1.35 despite the language discrepancy between § 14 and § 22. Unlike CEA provisions that simply authorize the CFTC to promulgate rules in furtherance of the Act's purposes (*see, e.g.,* 7 U.S.C. § 4a(j)), § 4g expressly makes compliance with Rule 1.35's record-keeping requirements an affirmative obligation under the Act itself. *See* 7 U.S.C. § 6g(a) (providing that "[e]very person registered hereunder as futures commission merchant ... shall keep books and records pertaining to [customer] transactions and positions in such form and manner and for such period as may be required by the Commission"). As a result, any violation of Rule 1.35 is a per se violation of the Act. Indeed, there is no possible scenario in which an FCM could violate Rule 1.35 but not violate § 4g.[19] As a matter of statutory construction, therefore, it is illogical to conclude that Congress would have supplied an express private cause of action under § 4g, without also intending for that right to encompass Rule 1.35. While the substantive duty to maintain daily trading records is contained in the Act itself, because the procedures for fulfilling that duty are fleshed out by the rule, the express right of action provided for violations of § 4g is much more meaningful and effective when the statute and rule are read together. *See Perry v. Dowling*, 95 F.3d 231, 238 (1996) (rules of statutory construction require that "statutes must be interpret-

---

19. In CFTC enforcement actions, the CFTC has routinely treated violations of § 4g and Rule 1.35 as coextensive. *See, e.g., In re Garrity*, 1997 WL 119944, at \* 3 (CFTC Mar. 19, 1997) (floor brokers violated both § 4g and Rule 1.35 by recording trading information on scratch paper or blank trading cards, without retaining the original source documents); *In re Preskin*, [1990–1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25, 235, at 38,680 (Feb. 10, 1992) (CFTC complaint alleging that defendant's failure "to immediately prepare a written record of the customer orders including account identification" violated § 4g and Rule 1.35).

ed to give meaning to all of their terms").[20]

There is an additional reason to permit a plaintiff to sue in federal court under Rule 1.35 where, as here, the defendant is a non-registrant. In 1982, as part of the amendments that added § 22 to the CEA, Congress also amended § 14 to restrict the reparations procedure to complaints brought against "any person who is registered." The amendment (which became effective in 1983) reversed an earlier amendment passed by Congress in 1978, which had enlarged the class of persons subject to the CFTC's reparations procedures to include "any person who is registered *or required to be registered.*" *See* 7 U.S.C. § 18, historical and statutory notes (emphasis added). The reason for this reversion, the House Report stated, was that:

> Over the courts of the past four years, the Commission has encountered several obstacles, not anticipated at the time its legislative changes were recommended [in 1978], to asserting reparations jurisdiction over so-called 'outlaw' firms or individuals. Unregistered firms and individuals often file in bankruptcy, are destitute, or have disappeared by the time a claim is asserted, resulting in uncollectible reparations awards. In these circumstances, the reparations process actually operates as a disservice to those who have already been harmed, by apparently promising recovery, which as a practical matter cannot be had. Moreover, these types of claims have served to delay the entire reparations process, thereby deferring the completion of cases where recovery is possible.

H.R.Rep. No. 565, 97th Cong.2d Sess. pt. 1 at 57, reprinted in 1982 U.S.Code Cong. & Admin. News 3906.

Of course, the result of this amendment is that plaintiffs who, like Ping He, have allegedly been harmed by a non-registrant, have no choice but to sue in federal court. If, as some courts have held, violations of the CFTC regulations can be remedied under § 14, but not under § 22, then plaintiffs like Ping He will have been rendered a disservice not intended by Congress. Certainly, nothing in the legislative history suggests that Congress intended to abridge the kinds of violations for which recovery could be sought against nonregistrants. If anything, the legislative history indicates that Congress hoped to help a plaintiff's chances of recovering against an "outlaw firm" by having that plaintiff sue *in federal court in the first instance.* Thus, to preclude private plaintiffs from suing nonregistrants for CFTC violations would produce the perverse and unintended effect of preventing recovery against the Act's worst violators—those who both fail to register and harm customers. *See United States v. Alpers,* 338 U.S. 680, 681, 70 S.Ct. 352, 353, 94 L.Ed. 457 (1950) ("The language of [a] statute may not be distorted under the guise of construction, or so limited by construction as to defeat the manifest intent of Congress.") Even as to nonregistrants who

**20.** Significantly, none of the cases which have declined to find an implied private right of action under the CFTC rules involved a CEA enabling provision which, like § 4g, explicitly makes compliance with the rule an obligation under the Act. At issue in those cases were Rules 166.3, 1.55 and 32.9. *See Fustok,* 618 F.Supp. at 1069 (no private right of action under Rule 166.3); *Bennett,* 597 F.Supp. at 1555 (same); *In re Conti-Commodity Servs.,* 733 F.Supp. at 1568 (same); *Khalid Bin Alwaleed Found.,* 709 F.Supp. at 820 (no implied right under Rules 166.3 or 1.55); *Procter & Gamble,* 925 F.Supp. at 1287–88 (no right under Rule 32.9). As to Rule 166.3, which requires that employers "diligently supervise" the trading-related activities of their employees, *see* 17 C.F.R. § 166.3, *Fustok* recognized that it is not clear pursuant to which Act provisions Rule 166.3 was promulgated. 618 F.Supp. at 1071. Moreover, *Fustok* found that recognizing a private right of action under Rule 166.3 would be at odds with the Act because § 13(b) of the CEA expressly limits the power to bring a derivative action to the CFTC. *Id.* at 1073. As to Rule 1.55, which appears to have been promulgated under § 4b, nothing in § 4b or any other provision of the CEA specifically mentions the rule's risk disclosure requirements, or makes it a duty under the Act to comply with those requirements. In fact, in 1974, the Senate proposed adding a provision to the Act which would have made it unlawful for FCMs to accept orders from any person unless such person first provided a statement acknowledging the risks involved in futures trading; but the Senate and House Conference deleted this provision from the CEA amendments ultimately passed by Congress. *See* H.R. Conf. Rep. No. 1838, 93rd Cong., 2nd Sess.1974, 1974 U.S.Code Cong. & Ad. News at 5894, 1974 WL 11582 (Sept. 27, 1974). Finally, Rule 32.9 simply tracks the language of § 4b, but bears no relationship to § 4b comparable to that between § 4g and Rule 1.35. *See* 17 C.F.R. § 32.9.

are legally exempt from registration, to shield them from liability for CFTC rule violations would undermine the CFTC's pronouncement that all market participants, whether required to be registered or not, must comply with all CFTC rules and Act requirements.

Concluding the *Cort* analysis, the third factor asks whether implication of a private remedy under Rule 1.35 is consistent with the underlying purposes of the legislative scheme. For the reasons already discussed, there is no question that it is. Rule 1.35 simply explicates the affirmative duty that already exists under § 4g, and for which Congress has already supplied a private right of action. Finally, the fourth *Cort* factor is easily satisfied because the regulation of futures trading is obviously one of federal concern, and not an area traditionally relegated to state law. For all of these reasons—but most importantly, because I find that Congress would not have supplied a private right of action under § 4g without intending for that right to encompass Rule 1.35—I conclude that Ping He may rely upon Rule 1.35 in this case.[21]

Significantly, even if Rule 1.35 did not provide a private cause of action, Ping He could maintain its claim against NFM for record-keeping violations directly under § 4g. While it is true that Rule 1.35 prescribes the "manner and form" in which records are to be kept, Ping He's cause of action derives from the duty provided in the Act itself to "maintain daily trading records for each customer in such manner and form as to be identifiable." 7 U.S.C. § 6g(c). Therefore, even if Rule 1.35 did not exist, NFM's complete and utter failure to keep any rec-

ords identifying what trades were made for Ping He, if proven, is conduct actionable under the Act. Similarly, in *Long v. Trans World Airlines, Inc.*, 913 F.2d 1262, 1267 (7th Cir.1990), a case involving the Airline Deregulation Act, the Seventh Circuit held that, whether or not the regulation relied upon by the plaintiffs implied a private cause of action, plaintiffs could maintain their claim because it "dr[ew] its essence from the statute itself," even if it was "factually bound" to the procedural requirements specified in the regulation. *Id.* at 1267. Accordingly, I will treat Ping He's claim against NFM for record-keeping violations as brought both under § 4g and Rule 1.35.

### C. *Analysis of Whether Ping He is Entitled to Summary Judgment*

The Court now must turn to the factual record in this case, to determine whether Ping He is entitled to summary judgment for NFM's alleged unauthorized trading, invoice falsification, and record-keeping violations. Discovery in this case occurred over more than two years, and the evidentiary record before the Court includes NFM's trading records, the affidavits and depositions of various NFM employees, and the deposition of Qiang (John) Zhou, the vice president of B.M. Corp. No depositions were taken of any personnel of Ping He or China Metals.

▮▮▮▮▮ First, I consider Ping He's claim that NFM engaged in unauthorized trading, in violation of § 4b of the CEA. To establish a § 4b violation for unauthorized trading, Ping He must demonstrate that NFM traded on its account "without the prior consent" of Ping He or its agent. 7 U.S.C. § 6b(d). In

---

**21.** I do not suggest by my holding that all CFTC rules imply private rights of actions. Indeed, there is no reason why finding implied rights of action under the CFTC rules must be an all-or-nothing proposition. It is beyond cavil that some statutory provisions and agency rules within an Act may give rise to implied private rights of action, whereas others may not. Thus, in the securities context, while the Supreme Court has recognized implied private rights of action under §§ 10(b) and 14(a) of the Securities Exchange Act, *see Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), *J.I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), it has refused

to imply a private right of action under § 17(a) of the Act, in light of the different language and purpose of that provision. *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). Furthermore, the mere fact that courts have implied a right of action under SEC Rule 10b–5 has not eliminated the need for courts to determine separately whether other SEC rules promulgated under § 10b of the Securities Exchange Act also imply a private right of action. *See, e.g., Metzner v. D.H. Blair & Co.*, 689 F.Supp. 262, 267 (S.D.N.Y.1988) (assessing whether Rule 10b–16, like Rule 10b–5, implies a private cause of action).

addition, § 4b has a scienter requirement, which requires Ping He to show that NFM's conduct was reckless, knowing or intentional. *See Drexel Burnham Lambert Inc. v. CFTC*, 850 F.2d 742, 748 (D.C.Cir.1988) ("recklessness is sufficient to satisfy section 4b's scienter requirement"); *First Commodity Corp. v. CFTC*, 676 F.2d 1, 7 (1st Cir.1982) (same); *Crothers v. CFTC*, 33 F.3d 405, 411 (4th Cir.1994) (same); *Hlavinka v. CFTC*, 867 F.2d 1029 (7th Cir.1989) (same); *CFTC v. Savage*, 611 F.2d 270, 283 (9th Cir.1979) (§ 4b scienter requirement is satisfied "when one acts in careless disregard of whether his acts amount to cheating, filing false reports, etc."); *Hammond v. Smith Barney, Harris Upham & Co., Inc.*, Comm. Fut. L. Rep. (CCH) ¶ 34,617, 1990 CFTC LEXIS 110, at *20 n. 21, 1990 WL 282810 (CFTC Mar. 1, 1990) ("reckless disregard of a statutory duty is sufficient to establish scienter").[22]

Turning to the facts, it is undisputed that neither Ping He nor China Metals ever authorized NFM to conduct specific trades for Ping He's account. However, Ping He has submitted no evidence rebutting the contention by NFM that all trading was properly authorized by B.M. Corp., a private company appointed by China Metals to execute trades for Ping He. In support of that contention, NFM has produced an April 27, 1993 letter from China Metals to NFM, stating:

> We would like to advise you that we, China National Metal Products . . . authorize Mr. John Zhou of NonFerrous B.M. Corp. to do some future business of metal products directly with you on our behalf.

(Ex. 2 to Wang Aff.) Although the letter does not identify the underlying account as belonging to Ping He, it references the account numbers of the two standby letters of credit established by Ping He for the account, and advises NFM that "[y]ou can settle all the outstanding account(s) of future trading with Mr. John Zhou under the said standby letters of credit." *Id.* At deposition, Mr. Zhou of B.M. Corp. similarly testified that China Metals authorized him to trade on Ping He's account, although he said that B.M. Corp. had no direct dealings or communications with Ping He. (Zhou Dep. at 45–49.)

Also significant is that China Metals' June 8, 1993 letter to NFM, which suspended trading on Ping He's account, began by stating, "[w]e are very pleased to see that we have made a little profits [sic] through those deals done with your brokerage." (Ex. C to 1997 Rosenthal Aff.) This statement alone suggests that China Metals was aware of at least some trading on the account. Based upon this collective evidence, I find that a material question of fact exists as to whether B.M. Corp acted as Ping He's agent. Accordingly, Ping He has not met its burden of demonstrating "the absence of a genuine issue as to any material fact" as to its claim of unauthorized trading, Fed.R.Civ.P. 56, and I deny summary judgment on that claim.

 With regard to Ping He's remaining claims, to establish a § 4b violation based upon the June 16 invoice, Ping He must show that the invoice was a "false report or statement" which NFM had "made or caused to be made." 7 U.S.C. § 6b. Ping He must also satisfy § 4b's scienter requirement, discussed above. As to § 4g and Rule 1.35, which do not contain any scienter requirement, Ping He must only show that NFM committed record-keeping violations which caused it injury. For the reasons discussed below, I find that Ping He has established violations under each of these statutory provisions.

This Court has spent a great deal of time reviewing the evidentiary record in this case. Even a cursory review, however, makes it painfully obvious that the losses reported in

**22.** Although the Second Circuit has yet to address whether recklessness satisfies the scienter requirement under § 4b, there is a basis to believe that it would join other appeals courts and the CFTC in holding that it does. In *Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105, 109 (2d Cir. 1986), the Second Court stated that courts interpreting § 4b of the CEA should look to interpretations given to the similar language in Rule 10b–5 of the Securities Exchange Act. Significantly, federal courts, including this Circuit, have long held that recklessness satisfies the scienter requirement under Rule 10b–5. *See Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 44–47 (2d Cir.1978) (reckless disregard of the truth or falsity of one's statements constitutes scienter). The reasons given by the Second Circuit in *Rolf* for its holding under Rule 10b–5 should apply with equal force to § 4b of the CEA.

the June 16 invoice were entirely falsified, and, furthermore, that NFM could not possibly have prepared an accurate invoice for any loss amount because NFM maintained no records indicating what trades were made on Ping He's behalf, and whether such trades resulted in profits or losses. First of all, none of the trading records produced by NFM, which NFM claims are evidence of trading for Ping He, contain Ping He's name or account number. Absent such identification, it is impossible to know whether the trades were in fact made for Ping He or some other customer. NFM tries to avoid liability for this blatant record-keeping violation by contending that it separately accounted for all trades made for Ping He in the "ZZ" account. However, this contention is belied not only by the very documents produced by NFM, but also by the statements of NFM's employees and counsel. To begin with, records produced in discovery reflect that trades conducted for the "ZZ" account began as early as February 1992, and continued as late as February 1994. But, undisputedly, Ping He did not open its account until sometime in April 1993, and China Metals suspended trading on the account in June 1993, only a few months later. Therefore, for NFM to contend that all trades in the "ZZ" account are attributable to Ping He is incredible. Even if trades for Ping He were placed in the "ZZ" account, NFM has admitted that the "ZZ" account included trades conducted for other customers.

NFM's counsel, Mr. Weihua Tang, conceded so much to the Court in his letter of May 28, 1996, in which he acknowledged that the "ZZ" account was an account maintained by B.M. Corp., which "apparently *included* the trades conducted on behalf of Ping He." In a follow-up letter dated June 5, 1996, Mr. Tang again stated that only "*certain* of the trades which [B.M. Corp.] instructed NFM to conduct in the 'ZZ' account, were actually conducted for the account of Ping He." Finally, at oral argument on May 30, 1997, Mr. Tang conceded that NFM employees simply "stuck everything into the ZZ account," without knowing whether or not trades ordered by B.M. Corp. were actually trades for Ping He or some other customer. (Transcript of May 30, 1997 hearing, at 19.) Likewise, NFM employees testified that, during 1993, all trades executed for B.M. Corp. were placed into the "ZZ" account without any regard for whether such trades were made on Ping He's behalf or for some other B.M. Corp. account. (*See* Deposition of Dawei Li, at 130; Gifford Aff. ¶ 4 .)

■ These various statements, together with the meager records from NFM's files, establish that NFM utterly failed to segregate Ping He's account from the accounts of other customers, and to maintain any records linking specific trades to Ping He. These failures constitute violations of § 4g's most basic requirement that FCMs maintain records "for each customer in such manner and form so as to be identifiable," 7 U.S.C. § 6g(c), and of Rule 1.35's requirement that FCMs' records "show separately for each account (including proprietary accounts): (i)[a]ll commodity futures transactions executed for such account, including the date, price, quantity, commodity and future." 17 C.F.R. § 1.35(b)(2). The record is also replete with evidence of other record-keeping violations by NFM, such as NFM's failure to record customer orders immediately upon receipt. In his affidavit, NFM's financial manager conceded that NFM's practice was to prepare trade tickets only after floor brokers had executed the trades. (Wang Aff. ¶ 29.) Thus, virtually all of NFM's trading tickets leave blank the order time, or else contain the same "order" and "fill" time. (*See* Ex. 9 to Wang Aff.)

The gross extent of NFM's record-keeping violations is fully revealed by NFM's complete inability to reconcile the trades listed in the June 16 invoice with its internal records, and by the disingenuous explanations NFM has offered the Court in trying to exculpate itself from liability. The June 16 invoice lists eleven trades allegedly made for Ping He between the dates of April 22 and April 29, 1993.[23] Although several of those trades re-

---

**23.** The chart contained in the June 16 invoice includes one column entitled "trade date," which lists transactions dating from April 20 to May 13, 1993. A second column, entitled "Liq. [liquidation] date," lists dates for those same transactions ranging from April 22 to June 3, 1993. It

port small profits, most of the trades report significant losses, with a reported net loss of $104,500. The June 16 invoice also charges Ping He for commissions, interest and margin call costs in the amount of $240,383, bringing the total invoice amount to $344,893.00. (Ex. D to Rosenthal Aff.) Of course, this number differs tremendously from the $800,000 that NFM claimed was owed just one month earlier when, on May 4, 1993, NFM tried unsuccessfully to draw down upon both letters of credit opened by Ping He.

After its dispatch of the June 16 invoice, but prior to this lawsuit, NFM repeatedly confirmed in writing to China Metals that $344,893.00 was the total balance due. (*See* letters attached as Ex. E to Rosenthal Aff.) Indeed, in one such letter, which responded to China Metals expressed concern about the invoice's accuracy, NFM insisted that $344,893.00 was the correct amount owed, stating "[w]e have once again cross-checked the trading confirmation telex ... with our computer records and have been unable to discover any discrepancies in respect of the captioned account."(July 20, 1993 letter, Ex. F to Rosenthal Aff.) Nevertheless, when Ping He filed this lawsuit in 1994, NFM counterclaimed for $650,000, returning to its earlier claim that Ping He's account had incurred more than $800,000 in losses. NFM's Answer made no attempt, however, to explain how it calculated the $650,000 figure. (Even if $800,000 in losses had been incurred by Ping He's account, because Ping He had already paid NFM $350,000 by that point, only $450,000 would have been outstanding.)

NFM changed its story yet again when discovery revealed that NFM possessed no trading tickets matching the trades described in the June 16 invoice. (*See* Ex. I to Rosenthal Aff., attaching all eight trading tickets produced by NFM reflecting trades made between April 22 and April 29 for the "ZZ" account; none match the entries in the June 16 invoice.) Moreover, in a computer summary produced by NFM, purporting to reflect all transactions conducted for the "ZZ" account between October 1992 and January 1994, the twelve trades listed between the dates of April 22 and April 29, 1993, all reflect *profits*, not losses. (Ex. J to Rosenthal Aff.) Discovery also revealed that on May 3, 1993, just one day before NFM claimed that Ping He had lost $800,000 as a result of trading losses, and one month before NFM sent China Metals the June 16 invoice, B.M. Corp. had written to NFM demanding the payment of $132,500 for trading profits. (*See* Ex. C to Tang's May 28, 1993 letter this Court.)

Corroborating the manifest conclusion to be drawn from these documents, Dawei Li, NFM's Vice–President, testified at deposition that the June 16 invoice was "not authentic" and that, as of May 4, 1993, "nothing" was owed by Ping He to NFM. (Li Dep., 5/8/96, morning session, at 110–111, evening session, at 11–12.) Thereafter, NFM's counsel, Mr. Tang, himself wrote to the Court, admitting not only that the June 16 invoice contained false information, but also that, during May 1993, NFM employees confirmed with B.M. Corp. that trading for the "ZZ" account between April 20 and April 28, 1993 had resulted in a net profit. (*See* Tang's May 28, 1996 Letter.) At the hearing held before this Court on May 30, 1997, Mr. Tang also conceded that, on May 4, 1993, when NFM sought to draw down completely upon the $800,000 letters of credit opened by Ping He, "the exact loss figure was probably not $800,000." (May 30, 1997 Transcript, at 23.)

Despite these admissions, NFM has refused to concede liability in this lawsuit, or even to withdraw its counterclaim against Ping He. Instead, continuing to deny that it committed any violations under the CEA, NFM has once again altered its version of the facts, this time positing B.M. Corp. as the true culprit. According to this latest account, when China Metals requested an account invoice, NFM asked B.M. Corp. to

---

would appear to this Court, therefore, that the relevant trading period extended from April 20 to June 3. However, both Ping He and NFM agree that the trades listed in the June 16 invoice reflect trading that occurred during the more

limited period of April 22 and April 29, 1993. Because my findings are unchanged no matter which of these two ranges of dates is used, I will defer to the parties' reading of the invoice.

prepare it; Helen Zhou, an NFM manager, then simply transferred the information supplied by B.M. Corp. to NFM's letterhead without reviewing it, and sent it to China Metals. (*See* Helen Zhou Aff. ¶¶ 3–4.) Thus, NFM argues, it is "B.M. Corp. who is responsible for any alleged misrepresentations made to Ping He" because B.M. Corp. "manipulated and tampered with the figures" that appeared in the June 16 invoice. (*See* Tang May 28, 1996 letter.) NFM also seeks to shift blame to B.M. Corp. for any record-keeping violations, on the ground that B.M. Corp. was at fault for "neglect[ing] to establish a separate account for Ping He with NFM." (*Id.*)

Rarely, if ever, has this Court seen a more tangled web of irrational excuses offered to a court of law than those offered here by NFM and its counsel. On one hand, NFM wants the Court to believe that B.M. Corp. was Ping He's agent—e.g., the customer—so that Ping He should be held responsible for all trading by B.M. Corp. in the "ZZ" account. At the same time, NFM shamelessly admits that when China Metals requested an invoice of all trading on the account, NFM turned to the alleged customer agent to supply that information. (The fact that NFM did not possess the necessary trading records to prepare the invoice itself is yet more proof of its flagrant record-keeping violations.) Adding insult to injury, NFM claims that, regardless of the falsity of the June 16 invoice, Ping He still owes it money for trades conducted "during other time periods, which resulted in losses which offset any profit." (See Tang's June 5, 1996 letter to the Court.) Of course, NFM has submitted no documentation supporting this claim.[24]

▉▉▉▉ Suffice it to say, NFM's positions are wholly untenable, and the law does permit FCMs to avoid liability under the Act by shifting their responsibilities to others. If, in fact, NFM relied upon B.M. Corp. to keep proper records, then B.M. Corp. was acting as NFM's agent—not Ping He's—and NFM would still be liable for the violations of its agent. *See In re Buckwalter,* [1990–1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,995, at 37,679 (Jan. 25, 1991) (FCM could not avoid liability for rule violations by contracting with third-party to collect information required by the rule; in that case, third party was FCM's agent, and FCM was still liable for agent's wrongdoing). Nor will NFM's claim that, until 1996, it had no idea that the June 16 invoice was false, absolve it from liability under § 4b. First of all, NFM's conduct in this matter strongly smacks of intentional fraud. How else can NFM explain the fact that, in July 1993, it told China Metals it had rechecked its records and confirmed the validity of the June 16 invoice, when in fact it possessed no such records and now tries to avoid liability on the basis that all relevant documentation was in B.M. Corp.'s possession? And what besides fraudulent intent can explain why, just one day after NFM had confirmed with B.M. Corp. that April trading in the "ZZ" account resulted in profits, NFM tried to draw down upon the letters of credit, claiming that Ping He had incurred $800,000 in losses?

At the very least, NFM is liable under § 4b based upon its admittedly reckless conduct in never bothering to check the losses reported in the June 16 invoice before sending it to China Metals. *See Hanly v. SEC,* 415 F.2d 589, 595 (2d Cir.1969) (in securities context, holding that "a salesman cannot deliberately ignore that which he has a duty to know and recklessly state facts about matters of which he is ignorant"); *Drexel Burnham Lambert,* 850 F.2d at 748 ("reckless inattention to obvious dangers to a client's interests … triggers liability under section 4b"); *First Commodity Corp. v. CFTC,* 676 F.2d at 7 (defining reckless conduct under § 4b as acts "depart[ing] so far from the standards of ordinary care that it is very difficult to believe the [actor] was not aware of what he was doing").[25]

---

**24.** Despite his statements to the Court that the June 16 invoice was the result of "manipulation" of trading figures by B.M. Corp., NFM's counsel also had the audacity to rely on the June 16 invoice in its opposition to summary judgment as proof of Ping He's trading losses, and in support of NFM's counterclaim. Mr. Tang's conduct

during this litigation is discussed more fully in the sanctions section, below.

**25.** As a last ditch attempt to avoid liability, NFM claims that, even if it violated the CEA, Ping He "ratified" its conduct by paying it $300,000 in

Given the record in this case, there is no question that Ping He is entitled to summary judgment based upon its claims that NFM violated § 4b, § 4g and Rule 1.35. No rational juror could possibly find NFM innocent of violations under these statutory provisions. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (summary judgment must be granted if the "record taken as a whole could not lead a rational trier of fact to find for the non-moving party"). As for damages, Ping He is entitled to recover both the $300,000 that it paid NFM based upon the false June 16 invoice, as well as its $50,000 initial deposit, which NFM converted to its own use to cover alleged trading losses that have been shown to be wholly unverifiable. *Cf. Knight v. First Comm. Fin. Group, Inc.*, [1994–1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,-515, at 43,319 (Oct. 5, 1995) (ordering return of customer's investment where "by not complying with record keeping requirements, [FCM][ ] virtually eliminated an audit trail, making it impossible ... to ascertain the

December 1993. This argument is meritless. The affirmative defense of ratification requires an FCM to prove that the customer clearly and unequivocally adopted the FCM's conduct with full knowledge of the facts. *See Herman v. T & S Commodities, Inc.*, 592 F.Supp. 1406, 1417–18 (S.D.N.Y.1984). Obviously, NFM has made no such showing here. Ping He credibly argues that it paid NFM the $300,00 only because it was misled by NFM into believing that it owed that amount and, furthermore, that it did not have full knowledge of NFM's violations until well after the initiation of this lawsuit. (*See* Transcript of May 30, 1997 at 13.)

26. Ping He argues that this Court must also award it prejudgment interest, pursuant to New York State law, CPLR 5004. I disagree. First of all, state law does not govern here. Where damages are awarded under a federal statute, it is federal law that determines whether prejudgment interest can or must be awarded to a prevailing party. Ping He has completely failed, however, to brief the question of whether the Commodity Exchange Act permits awards of prejudgment interest. Denial of its request for prejudgment interest is warranted on that basis alone. In any event, the fact of the matter is that the CEA does not contain any provisions concerning the award of prejudgment interest, and, therefore, it is entirely within this Court's discretion to permit or deny such an award. *See*

manner in which their accounts were traded").[26]

I also grant summary judgment in favor of Bank of China in the related action. The law is well settled that a bank is not legally obligated to pay a beneficiary under a standby letter of credit when the beneficiary submits a fraudulent demand for payment. *See Recon/Optical, Inc. v. Government of Israel*, 816 F.2d 854, 858 (2d Cir.1987) ("'fraud in the transaction' doctrine is an exception to the general rule that a letter of credit is independent of the underlying obligation it secures") (citation omitted); *Rockwell Int'l Systems, Inc. v. Citibank, N.A.*, 719 F.2d 583, 588–89 (2d Cir.1983) (a bank's obligation under a letter of credit does not extend to protect a party that seeks to "'runs off with [the] plaintiff's money on a pro forma declaration which has absolutely no basis in fact'") (quoting *Dynamics Corp. of America v. Citizens & Southern Nat'l Bank*, 356 F.Supp. 991, 999 (N.D.Ga.1973)).

Here, NFM's May 4, 1993 demand for the payment of $800,000 under the letters of credit was fraudulent in at least two respects.

*Abou–Khadra v. Mahshie*, 4 F.3d 1071, 1084 (2d Cir.1993) ("Whether to award prejudgment interest in cases arising under federal law has in the absence of a statutory directive been placed in the sound discretion of the district courts.") (quoting *Lodges 743 and 1746, Int'l Ass'n of Machinists v. United Aircraft Corp.*, 534 F.2d 422, 446 (2d Cir.1975). *See also Federal Deposit Ins. Corp. v. UMIC, Inc.*, 136 F.3d 1375, 1388 (10th Cir.1998) (award of prejudgment interest on successful federal claims must be based on district court's weighing of the equities). Here, even had Ping He properly briefed the law, I would have denied its request for prejudgment interest in light of Ping He's troubling conduct during this litigation. Particularly troubling has been Ping He's unequivocal denial that B.M. Corp. operated as its agent, despite documents evidencing that Ping He gave China Metals authority to appoint a secondary agent for Ping He's account and that China Metals appointed B.M. Corp. to act in that capacity. Furthermore, Ping He's denial that any trading ever took place for Ping He is hardly believable given that Ping He paid NFM $350,000, without complaint, prior to bringing this lawsuit. Thus, Ping He, like NFM, has not been entirely forthcoming with this Court. For these reasons, and because of the close familial relationship between Ping He and NFM, both of which are wholly owned by the Chinese government, I decline to award prejudgment interest as a matter of equity.

First, as the evidentiary record clearly establishes, Ping He did not owe NFM $800,000 on May 4, 1993. (*See, e.g.,* Li Dep., at 110–111, testifying that as of May 4, 1993, "nothing" was owed by Ping He to NFM; *see also* May 30, 1997 transcript of hearing at which NFM's counsel admitted that, when NFM sought to draw down on the letters of credit, "the exact loss figure was probably not $800,-000.") Second, although NFM certified to Bank of China that it had telexed Ping He notice of its payment demand, as NFM was required to do by the terms of the letters of credit, NFM has since conceded that notice was not, in fact, telexed to Ping He. (*See* Ex. B to Rosenthal Aff.; *see also* NFM's Mar. 20, 1997 brief at 39, admitting that NFM sent notice by fax and mail).[27] For both of these reasons, NFM's demand for payment by Bank of China was fraudulent and false, and Bank of China cannot be held liable for its failure to make the payment. *See Prutscher v. Fidelity Int'l Bank,* 502 F.Supp. 535, 536–37 (S.D.N.Y.1980) (dismissing lawsuit for bank's for failure to pay funds under letter of credit, where evidence established that beneficiary had presented bank with fraudulent documents).

### D. *Sanctions*

■ The final issue to be decided is whether to impose sanctions upon NFM or NFM's counsel, Mr. Tang, for their conduct during this litigation. Federal Rule 11(b) of Civil Procedure provides that:

> [b]y presenting to the court (whether by signing, filing submitting, or later advocating) a pleading, written motion, or other paper, an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, ——
>
> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions therein are warranted by ex-

isting law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

It is within the court's discretion to "impose an appropriate sanction" upon any "attorney, law firms, or parties" that have violated Rule 11(b). Fed.R.Civ.P. 11(c). *See also Morley v. Ciba–Geigy Corp.,* 66 F.3d 21, 24 (2d Cir. 1995) (in deciding whether to impose sanctions for violation of the rule, "[d]istrict courts have wide discretion") (citing *Sanko Steamship Co. Ltd. v. Galin,* 835 F.2d 51, 53 (2d Cir.1987)).

■ Significantly, a litigant's affirmative obligations under Rule 11 are not measured solely as of the time that papers are filed or submitted to the court. Rather, "a litigant's obligations . . . include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit." *O'Brien v. Alexander,* 101 F.3d 1479, 1489 (2d Cir.1996) (quoting Advisory Committee's comments accompanying 1993 amendment of Rule 11). Therefore, the continued assertion of a factual or legal argument long after that argument has proven to be utterly baseless is sanctionable conduct. *Id.* Other factors that the Advisory Committee has directed courts to consider in determining whether Rule 11 sanctions are appropriate include: "[w]hether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar conduct in other liti-

---

**27.** In opposing summary judgment, NFM argues that it tried to telex Ping He, but had to resort to fax and mail because Ping He's telex machine was not working. *Id.* Because this assertion is wholly unsupported by any evidence or any affidavit based upon personal knowledge, I do not credit it.

gation; whether it was intended to injure; [and] what effect it had on the litigation process in time or expense." *Id.* After considering these factors and scrutinizing with great care all of NFM's and its counsel's submissions to and interactions with this Court, I conclude that sanctions should not be imposed upon NFM, but that they must be imposed upon NFM's counsel.

Mr. Tang and his firm, The Law Offices of Tang & Associates, Inc., first appeared in this litigation as NFM's counsel in August 1995, more than one year after Ping He filed this lawsuit. Prior to that time, NFM had been represented by other counsel, which withdrew from the case because of a conflict arising from its joint representation of NFM and B.M. Corp. This Court consented to the change of counsel on August 9, 1995. Thus, when Mr. Tang took over the representation of NFM, NFM had already filed its answer and counterclaim against Ping He, as well as its related action against Bank of China. Because Tang can be sanctioned only for his own misconduct, and not for the conduct of attorneys who preceded him, I need not consider whether the original filing of NFM's answer and counterclaim, and of the lawsuit against Bank of China, constituted sanctionable conduct. Key to my decision to sanction Tang, however, is that he continued to advocate the factual and legal claims raised in those initial pleadings long after he personally learned they had no merit.

Tang's most flagrant violations of Rule 11(b) have been of subsection (2), which imposes an affirmative obligation on attorneys to make sure the factual contentions contained in their submissions have evidentiary support, or are likely to have evidentiary support after further investigation. Here, Tang's post-discovery submissions contained bald-faced misrepresentations of the factual record (particularly as to the June 16 invoice and NFM's counterclaim for $650,000) that contradicted Tang's own prior admissions to the Court. As discussed above, by letter dated May 28, 1996, Tang admitted to the Court that the June 16 invoice was falsified, and that April 1993 trading on the "ZZ" account had, in fact, resulted in profits. (*See* Tang's

May 28, 1996 letter.) In that same letter, Tang also admitted that Ping He's account had not been segregated from other customer accounts, although Tang tried to blame that failing upon B.M. Corp. *Id.* (stating that "Mr. Zhou of B.M. Corp.... neglected to establish a separate account for Ping He with NFM"). To be sure, Tang had little choice but to make these admissions because, by the Spring of 1996, documents produced from NFM's own files had revealed that: (i) no trading records matched the trades in the June 16 invoice; (ii) NFM possessed no trading tickets specifically linking *any* trading losses to Ping He; (iii) trading in the "ZZ" account could not possibly have been done exclusively for Ping He because the "ZZ" account pre-dated and post-dated Ping He's own account with NFM; and (iv) trading for the "ZZ" account on the dates referenced in the June 16 invoice had resulted in profits, not losses. Furthermore, Dawei Li, who was NFM's designated corporate representative pursuant to Fed.R.Civ.P. 30(b)(6), testified on May 8, 1996, that "nothing" was owed by Ping He as of May 4, 1994, and that, from his review of NFM's trading records, there was no documentary support for NFM's $650,000 counterclaim. (Li Dep., 5/8/96 evening session at 196–97.) Accordingly, as of the date Tang wrote his May 28, 1996 letter to the Court, it was abundantly clear that NFM had no evidentiary support for claiming that the June 16 invoice for $344,893 was valid. Nor did Tang have any factual basis for claiming that NFM had properly demanded the payment of $800,000 on May 4, 1993, or that Ping He still owed NFM $650,000.

Had Tang, after sending his May 28, 1996 letter to the Court, instructed his client to concede liability and withdraw its claims against Ping He and Bank of China, this Court would now be commending him, not sanctioning him. But that is not the course Tang chose. Rather, despite his own admissions to the Court and the glaring evidence against his client, Tang continued to press legal claims against Ping He and Bank of China, and to oppose summary judgment on the basis of factual and legal contentions he knew to be false. He did so without a shred of evidentiary or legal support. For instance, only a few months after sending his

May 28 letter to the Court, Tang argued in his briefs opposing summary judgment that "NFM is indeed able to identify trades that were authorized by Ping He" and that "[t]here is no question that NFM maintained proper account records" for Ping He. (Apr. 20, 1997 Brief at 4; Aug. 22, 1996 Brief at 18.) It is unfathomable that Tang could assert such claims when all of the documents and witness testimony in this case firmly established that NFM could not identify any trades for Ping He and did not maintain proper records. Moreover, in a prior letter to the Court dated July 16, 1996, Tang has already confessed that "[w]ith respect to [Ping He]'s allegations that NFM has been unable to identify which trade tickets relate to the trades conducted on behalf of Ping He, this is true. NFM has always maintained the position that only John Zhou/B/M. Corp. had knowledge as to which trades were conducted on behalf of Ping He."

Next, even after Tang flatly admitted that the June 16 invoice was a falsified document, on September 25, 1996, he signed a 3(g) statement in which he relied upon the $344,893 invoice as proof of Ping He's trading losses. Likewise, in his brief opposing summary judgment, Tang attempted a complete about-face, arguing that "[w]hether [B.M. Corp.] falsified this ·document [the June 16 invoice] is pure conjecture on the part of Ping [He]'s counsel." (Sept. 15, 1997 brief at 13.) Incredibly, in the same 3(g) statement, Tang claimed that Ping He owed the total amount of $466,037.50 and the total amount of $455,000—apparently unconcerned by the inconsistency of these assertions. (*See* NFM's 3(g) statement ¶¶ 11–13).[28]

In NFM's 3(g) statement, Tang also denied the factual contention by Ping He that "[n]one of the trades reflected on the June 16, 1993 invoice were actually executed by NFM for Ping He, and no broker statements, trade tickets, or confirmations exist reflecting any such trades." In denying this paragraph, Tang cited only to a portion of the deposition testimony of John Zhou, a B.M. Corp. employee, in which Zhou said nothing that could possibly be regarded as supporting this denial.[29] Tang's groundless denial of this paragraph, in violation of Rule 11(b)(4), is even more deplorable given that NFM's own company witness, Dawei Li, had previously testified that none of NFM's trading records supported the trades reported in the June 16 invoice.

Significantly, Tang was not without warning before he signed and submitted the 3(g) statement and briefs opposing summary judgment to the Court. On September 13, 1996, by written order, I expressly warned Tang to include in NFM's 3(g) statement only "competent evidence based on personal knowledge" and to "exercise care and caution in admitting, denying, or qualifying NFM responses." (September 13, 1996 Court Order, at 1.) I warned Tang in this manner because he had earlier submitted to this Court affidavits signed by NFM employees who had no personal knowledge of the facts to which they were testifying. Obviously, Tang ignored the Court's warning.

Tang's submissions also reflect an appalling disregard for his professional duty to assert legally sound arguments that are

**28.** The irrational and conflicting representations made by Tang in NFM's 3(g) statement underscore the need to sanction his conduct. At the same time that Tang represented in the 3(g) statement that $344,893 was due on the June 16 invoice, he asserted the Ping He owed "at least $466,037.50," for the sum alleged due in the "ZZ" account as of the date Ping He filed suit. (3(g) statement ¶ 11.) And in the very next paragraph, Tang tried to justify NFM's May 4, 1993 demand for $800,000 from Bank of China by representing that "in addition to the $344,893 due," Ping He owed NFM an additional $455,000 for "margin calls coming due." (3(g) statement ¶¶ 12–13.) For the reasons fully discussed in the text above, these various representations were made without factual support and are obvi-

ously inconsistent with each other, with Tang's prior admissions to the Court, and with the evidentiary record.

**29.** The entire portion cited by Tang of Zhou's deposition in support of NFM's denial does not even address the June 16 invoice, and merely states:

Q. Did you keep your record of the trades conducted for Mr. Li Zheng [of China Metals]?
A. What record?
Q. Record of transactions.
A. We got all the confirmation [sic] from Nonferrous [NFM]. Whatever they faxed us we had.
(Zhou Dep., at 167, lines 20–25.)

grounded in the existing law. *See* Fed. R.Civ.P. 11(b)(2). First of all, he simply ignored the plain language of the CEA and CFTC rules, and the requirements they impose upon FCMs. Thus, Tang repeatedly argued, citing no legal authority, that NFM had not violated any of the CEA's or CFTC's statutory requirements. Equally frivolous was Tang's argument to the Court that NFM could not be held liable for CEA and CFTC rule violations because B.M. Corp. was the entity that falsified the June 16 invoice, and that should have segregated Ping He's trading account and maintained proper trading records. Aside from the many factual problems with this argument, Tang had absolutely no legal basis for asserting that an FCM can escape liability for its affirmative obligations under the CEA and CFTC rules by shifting those obligations to an agent, let alone to the customer's agent. No such escape hatch exists. As discussed earlier, even if NFM had retained B.M. Corp. to perform *certain of its* responsibilities, NFM at all times remained liable for B.M. Corp.'s violations. Furthermore, even the "proprietary account" exemption upon which NFM relied to argue that it did not have to register, expressly conditions exemption upon "such a person remain[ing] subject to all other provisions of the Act and of the rules, regulations and orders thereunder." 17 C.F.R. § 3.10(c).

Also frivolous was Tang's persistent legal claim against Bank of China for failing to pay NFM $800,000 under the standby letters of credit. Tang pressed this claim even after conceding that $800,000 was not owed by Ping He at the time NFM demanded it, and that NFM had not complied with Bank of China's telex requirement. In doing so, he ignored Second Circuit authority holding that fraud is a complete defense in an action against a bank for failure to pay under a standby letter of credit. *See Recon/Optical, Inc. v. Government of Israel,* 816 F.2d 854, 858 (2d Cir.1987); *Rockwell Int'l Systems, Inc. v. Citibank, N.A.,* 719 F.2d 583, 588–89 (2d Cir.1983).

Tang also frivolously argued that Ping He's action was time-barred, although Ping He filed its complaint well within the two-year statutory limitations period *see supra*

note 5. In addition, Tang argued that Ping He lacked privity to sue NFM, although NFM admitted throughout this litigation that it had received funds directly from Ping He. Finally, in response to the instant sanctions motion by Ping He and Bank of China, Tang moved, frivolously, to sanction Ping He's counsel for filing a frivolous complaint.

In sum, Tang's utter disregard for the law and the facts in this case mandate the imposition of sanctions. Tang has violated every subsection of Rule 11(b), and his conduct ranks among the worst this Court has seen from a lawyer. Clearly acting in bad faith, Tang continuously tossed out muddled, inconsistent arguments in a fact sensitive case. This Court has had to spend countless hours slogging through three sets of Tang's incoherent submissions, which were intended merely to camouflage his client's plain liability. To decline to impose sanctions in a case such as this would send Tang, and others like him, the message that our legal system will tolerate lawyers who practice law without care, and who needlessly delay litigations by pressing meritless claims and creating confusion where there need not be any.

Unlike the strong basis that exists for sanctioning Tang's conduct in this case, I find that sanctions of NFM are not warranted. The record does not indicate with any certainty that NFM contributed to the factual misrepresentations or untenable legal positions advanced by its lawyer. To the contrary, Dawei Li, who testified as the company's representative, appears to have testified truthfully that the June 16 invoice was false, that nothing was owed by Ping He as of May 4, 1993, and that none of NFM's trading records supported its $650,-000 counterclaim. (Li Dep., 5/8/96, morning session, at 110–111, evening session at 11–12.) As to the other witnesses who testified or submitted affidavits in the case, most did so in their capacities as former NFM employees or employees of B.M. Corp., not as NFM representatives. Their testimony, therefore, cannot be attributed to NFM for purposes of sanctions. Certainly, NFM may be faulted for failing to object to the baseless and contradictory positions being advocated by its lawyer. But even in that re-

gard, it is not clear to the Court that those persons at NFM who retained Tang were fluent enough in English to understand the content of Tang's submissions to the Court, or to appreciate that submitting those papers constituted wrongful conduct. Under the circumstances, only NFM's lawyer should be sanctioned. *See Calloway v. Marvel Entertainment Group*, 854 F.2d 1452, 1474 (2d Cir.1988) ("We believe that a party represented by an attorney should not be sanctioned for papers signed by the attorney unless the party had actual knowledge that filing the paper constituted wrongful conduct, e.g., the paper made false statements or was filed for an improper purpose.... Where the attorney fails to advise an unwary client of the wrongfulness of such conduct, the burden of sanctions should fall entirely upon the attorney."), *rev'd on other grounds sub nom., Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989).

### (i) The Amount of Sanctions

Imposing Rule 11 sanctions upon an attorney is a serious matter and courts must exercise their power to do so with great care. *See Mackler Productions, Inc. v. Cohen*, 146 F.3d 126, 127 (2d Cir.1998) (warning that Rule 11 sanctions must be imposed with caution because "[u]nlike most areas of law, where a legislature defines both the sanctionable conduct and the penalty to be imposed, civil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct.") (quoting *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 831, 114 S.Ct. 2552, 2559, 129 L.Ed.2d 642 (1994)). The sanction imposed must fit the infraction, not overshadow it. Furthermore, in order not to chill creative advocacy, sanctions should be limited to that amount which is necessary to deter repetition of the sanctionable conduct. *See Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 504

(2d Cir.1989); Advisory Committee notes to Fed.R.Civ.P. 11.

Although Rule 11 was not designed to be a fee-shifting mechanism, *see Estate of Calloway v. Marvel Entertainment Group*, 9 F.3d 237, 241 (2d Cir.1993), where appropriate, monetary sanctions may take the form of an attorney's fees award to the party that has been subjected to the sanctionable conduct. *See, e.g. Thomas America Corp. v. Fitzgerald*, 175 F.R.D. 462, 466 (S.D.N.Y.1997) (requiring counsel to pay opposing party's attorney's fees as sanction for bringing frivolous motion to dismiss); *Forbes v. Merrill Lynch, Fenner & Smith, Inc.*, 179 F.R.D. 107, 111 (S.D.N.Y.1998) (imposing $25,000 sanction under Rule 11, payable to defendants as counsel fees); *Schlaifer Nance & Co., Inc. v. Warhol*, 7 F.Supp.2d 364 (S.D.N.Y.1998) (imposing sanctions of $400,000 to compensate opposing party for attorney's fees incurred defending against frivolous claims). In imposing this form of compensatory sanction, courts should award "only that portion of a [party]'s attorney's fee thought reasonable to serve" the purpose of the sanctions. *Eastway Constr. Corp. v. City of New York*, 821 F.2d 121, 123 (2d Cir.1987).

I find that requiring Tang and his law firm to pay a portion of Ping He's and Bank of China's attorney's fees is an appropriate sanction in this case.[30] First of all, a substantial sanction is warranted in light of the severity of Tang's Rule 11 violations. While bad faith is not a prerequisite to imposing sanctions under Rule 11, *see MacDraw, Inc. v. CIT Group Equip., Fin. Inc.*, 73 F.3d 1253, 1259 (2d Cir.1996), there is no question that Tang's misrepresentations of the factual record were willful and deliberate. Furthermore, Tang's baseless contentions infected every paper he submitted to this Court following his May 28, 1996 letter; he engaged in a pattern of improper conduct, not one isolated event. Nor is it unimportant that Tang committed these violations after

---

**30.** Although it is permissible to sanction an attorney personally, Rule 11 provides that "[ab]sent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees." Fed.

R.Civ.P. 11(c)(A). Here, sanctioning both Tang and his firm is appropriate, particularly because Tang appears to be the principal attorney of his firm.

this Court's express warning to him that his assertion of factual contentions without evidentiary support would be sanctioned. I also note that his response to this sanctions motion has been, at best, unapologetic.[31]

In view of the above, I impose a sanction upon Tang and his law firm requiring them, jointly and severally, to compensate Ping He and Bank of China for the counsel fees and expenses incurred in litigating this action following Tang's submission of his May 28, 1996 letter to the Court. I choose May 28, 1996 as the pivotal date because, as Tang's letter evidences, by that date it was clear and unequivocal that Tang had no good faith basis for denying that NFM had committed violations of the CEA and CFTC rules, or for continuing to press NFM's monetary claims against Ping He and China Metals based upon the falsified invoice sent to Ping He and the falsified declaration submitted to Bank of China.

I can not decide the precise amount of the sanction to be imposed upon Tang and his law firm until Ping He and Bank of China provide the Court with their counsel's billing records. I direct them to do so no later than October 9, 1998. The billing records they submit should include only non-duplicative time billed for the two related cases after May 28, 1996. Furthermore, I direct Ping He's counsel to exclude from its billing records all time spent researching and preparing the supplemental briefs dated August 25 and September 25, 1997, and the accompanying affidavits, concerning NFM's registration status. The Court requested this additional briefing only because Ping He's counsel repeatedly insisted that a violation of the CEA's registration provisions, without more, would automatically require summary judgment in this action. As discussed earlier in

this opinion, Ping He's counsel was wrong on the law in that respect. *See supra* note 10. It would be unfair, therefore, to require Tang to recompense Ping He's counsel for time spent on a claim that was itself legally meritless.

Tang is hereby directed to submit any objections he has to the billing records submitted by Ping He and Bank of China no later than October 20, 1998. Ping He and Bank of China may respond to such objections by October 27, 1998. The parties are to appear for a hearing before the Court on November 17, 1998, at 4:30 p.m., at which time I will determine the total amount of the sanction to be imposed.

### CONCLUSION

The Court understood that, in the event that it granted summary judgment on any of Ping He's claims for the return of the $350,000, Ping He would forego its remaining claims in this action. For the reasons discussed, I grant Ping He's motion for summary judgment in Case 94 Civ. 4105, and award Ping He $350,000 in damages. Furthermore, in Case 94 Civ. 6161, I grant Bank of China's motion for summary judgment and dismiss the complaint in its entirety. The Clerk of the Court should enter judgment immediately on both actions in accordance with this Opinion. Finally, I impose sanctions upon Mr. Weihua Tang and the Law Offices of Tang & Associates, jointly and severally, in an amount to be determined in accordance with this Opinion and to be entered in a separate order once determined. **SO ORDERED.**

---

**31.** Tang did not avail himself of the "safe-harbor" provision under Rule 11, which gives a litigant 21 days after a sanctions motion is served—but before it is presented to the Court—to withdraw or correct the challenged claims or assertions. Fed.R.Civ.P. 11(c)(1)(A). In this case, Ping He and Bank of China served their sanctions motion against Tang and NFM on February 27, 1997, and filed it with the Court on April 10, 1997, giving Tang well over a month in which to correct his conduct. However, at no time during that period, or thereafter, did Tang

seek to withdraw any of his factual or legal representations to the Court. It is also worthy of note that Ping He and Bank of China initially moved for sanctions against Tang and NFM on September 9, 1996. Because I denied that initial motion with leave to renew, I consider only the 1997 filing relevant for purposes of satisfying Rule 11's safe harbor provision. But the fact that Ping He and Bank of China had moved for imposition of sanctions once before gave Tang even longer notice and opportunity to correct his conduct.